**LTTS CHARTER SCHOOL, INC. d/b/a Universal Academy, Petitioner,**

v.

**C2 CONSTRUCTION, INC., Respondent.**

**No. 09–0794.**

Supreme Court of Texas.

Argued Dec. 7, 2010.

Decided June 17, 2011.

Thomas Anthony Fuller, The Fuller Law Group, PLLC, Arlington, for Petitioner.

Brian W. Erikson, Timothy A. York, Quilling, Selander, Cummiskey & Lownds P.C., Dallas, for Respondent.

Veronica Leticia Garcia, Texas Charter Schools Association, Cobby A. Caputo, Bickerstaff Heath Delgado Acosta LLP, Kristofer S. Monson, Assistant Solicitor General, Austin, for Amici Curiae.

Justice WILLETT delivered the opinion of the Court, in which Justice HECHT, Justice WAINWRIGHT, Justice GREEN, Justice JOHNSON, and Justice LEHRMANN joined.

Since 1995, open-enrollment charter schools have been a part of the Texas public-school system. These nontraditional public schools, created and governed by Chapter 12 of the Education Code, receive government funding and comply with the state's testing and accountability system, but they operate with greater flexibility than traditional public schools, in hopes of spurring innovation and improving student achievement.

This interlocutory appeal poses a narrow issue: Is an open-enrollment charter school a "governmental unit" as defined in Section 101.001(3)(D) of the Tort Claims

Act[1] and thus able to take an interlocutory appeal from a trial court's denial of its plea to the jurisdiction?[2] We answer yes. An open-enrollment charter school qualifies under the Tort Claims Act as an "institution, agency, or organ of government" deriving its status and authority from legislative enactments.[3] Accordingly, it may bring an interlocutory appeal. We reverse the court of appeals' judgment dismissing the interlocutory appeal for lack of jurisdiction and remand to that court to reach the merits of the school's immunity claim.

## I. Background

LTTS Charter School, Inc., d/b/a Universal Academy, is an open-enrollment charter school that retained C2 Construction, Inc. to build school facilities at a site Universal Academy had leased. C2 filed a breach-of-contract suit, and Universal Academy filed a plea to the jurisdiction claiming immunity from suit. The trial court denied the plea, and Universal Academy brought an interlocutory appeal under Section 51.014(a)(8) of the Civil Practice and Remedies Code. In the court of appeals, C2 moved to dismiss the interlocutory appeal, arguing Universal Academy was not entitled to one because it is not a "governmental unit" under the Tort Claims Act.[4] The court of appeals agreed and dismissed the interlocutory appeal.[5]

We granted Universal Academy's petition for review to address whether the court of appeals properly dismissed the interlocutory appeal. Regardless of whether we have jurisdiction over the substance of an interlocutory appeal, we have jurisdiction to determine whether the court of appeals properly determined its own jurisdiction—the only issue raised in the petition and the briefing.[6]

## II. Discussion

### A. Standard of Review

A statute's meaning is a question of law we review de novo.[7] Our goal in construing a statute is to honor the Legislature's expressed intent,[8] and ordinarily the truest manifestation of legislative intent is legislative language—the words the Legislature chose.[9] We thus give unambiguous text its ordinary meaning, aided by the interpretive context provided by "the surrounding statutory landscape."[10]

### B. Statutory Provisions

Section 51.014(a)(8) permits an appeal of an interlocutory order that "grants or denies a plea to the jurisdiction by a governmental unit as that term is defined in Section 101.001."[11] Section 101.001(3) states a four-part definition of "govern-

1. *See* Tex. Civ. Prac. & Rem.Code § 101.001(3)(D).

2. *Id.* § 51.014(a)(8) (permitting an appeal from an interlocutory order of a district court order that "grants or denies a plea to the jurisdiction by a governmental unit as that term is defined in Section 101.001").

3. *See id.* § 101.001(3)(D).

4. 288 S.W.3d 31, 32.

5. *Id.* at 38.

6. *See Klein v. Hernandez*, 315 S.W.3d 1, 3 (Tex.2010).

7. *See First Am. Title Ins. Co. v. Combs*, 258 S.W.3d 627, 631 (Tex.2008).

8. *See City of DeSoto v. White*, 288 S.W.3d 389, 394 (Tex.2009).

9. *See Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 651 (Tex.2006).

10. *See Presidio Ind. Sch. Dist. v. Scott*, 309 S.W.3d 927, 929–30 (Tex.2010).

11. Tex. Civ. Prac. & Rem.Code § 51.014(a)(8).

mental unit," including this broad provision:

> (D) any other institution, agency, or organ of government the status and authority of which are derived from the Constitution of Texas or from laws passed by the legislature under the constitution.[12]

Universal Academy argues it qualifies under this catch-all language as an "institution, agency, or organ of government" deriving its status and authority from statutory enactments.[13] C2 Construction disputes that this statutory provision, or any other, bestows "governmental unit" status on open-enrollment charter schools.

■ Our cases "strictly construe Section 51.014(a) as a narrow exception to the general rule that only final judgments are appealable."[14] Today's decision, however, turns not on the "strictness" or "narrowness" of Section 51.014(a) but on a simpler ground: whether Universal Academy fits within the Legislature's broad definition of "governmental unit" in Section 101.001(3)(D).[15]

We have received two amici curiae briefs, both supporting Universal Academy, one from the State of Texas (whose views the Court requested) and one from the Texas Charter Schools Association.

Both amici echo Universal Academy's contention that it falls within Section 101.001(3)(D), and we agree: An open-enrollment charter school qualifies as a "governmental unit" under the Tort Claims Act.

## C. The "Status and Authority" of Open–Enrollment Charter Schools Arise From Statute.

■ Open-enrollment charter schools, governed by Chapter 12 of the Education Code, are indisputably part of the Texas public-education system. Several statutes in the Education Code and elsewhere amply demonstrate that open-enrollment charter schools derive their governmental "status and authority" from legislative enactments. Capped at 215 statewide,[16] open-enrollment charter schools are one of three classes of charter schools created by Chapter 12.[17] These open-enrollment charter schools are authorized to "operate in a facility of a commercial or nonprofit entity, an eligible entity, or a school district, including a home-rule school district."[18]

Chapter 12 of the Education Code, which authorizes the operation of charter schools, seeks to "ensure[ ] the fiscal and academic accountability" of charter holders

---

12. *Id.* § 101.001(3)(D).

13. Universal Academy also argues it qualifies for "governmental unit" status as a "political subdivision" under Section 101.001(3)(B), specifically as a "school district." *See id.* § 101.001(3)(B). We need not discuss Subsection (3)(B) since we hold that open-enrollment charters fall under Subsection (3)(D).

14. *See, e.g., Tex. A & M Univ. Sys. v. Koseoglu,* 233 S.W.3d 835, 841 (Tex.2007) (quotations and citation omitted).

15. Tex. Civ. Prac. & Rem.Code § 101.001(3)(D).

16. Tex. Educ.Code § 12.101.

17. *Id.* § 12.002 (stating that the three classes of charter schools are: "(1) a home-rule school district charter ...; (2) a campus or campus program charter ...; or (3) an open-enrollment charter ...."); *see id.* § 12.011 (describing the "[a]uthorization" for and "[s]tatus" of home-rule school district charter schools); *see id.* § 12.052 (describing the "[a]uthorization" for campus or campus program charter schools); *see id.* § 12.101 (describing the "[a]uthorization" for open-enrollment charter schools); *see id.* § 12.105 (describing the "[s]tatus" of open-enrollment charter schools).

18. *Id.* § 12.101.

while still preserving the "innovations of charter schools" from excessive regulation.[19] As publicly funded institutions,[20] charter schools are designed to spark academic innovation and thus boost student learning.[21] Additionally, charter schools "increase the choice of learning opportunities within the public school system," "create professional opportunities that will attract new teachers to the public school system," and "establish a new form of accountability for public schools."[22]

As for status, Section 12.105 of the Education Code—titled "Status"—statutorily (and categorically) declares open-enrollment charter schools to be "part of the public school system of this state."[23] In addition, Section 11.002 explains that charter schools are "created in accordance with the laws of this state" and, together with traditional public schools, "have the primary responsibility for implementing the state's system of public education...."[24] Moreover, Section 12.1053 confers "governmental entity" status, "political subdivision" status, and "local government" status on open-enrollment charter schools for purposes of myriad public purchasing and

contracting laws (like dealings with construction companies).[25]

As for authority, that too derives from "laws passed by the legislature under the constitution."[26] Several statutes discuss the authority that open-enrollment charter schools may exercise under their charters. The most explicit grant of authority is Section 12.104(a), which provides that open-enrollment charter schools have "the powers granted to [traditional public] schools" under Title 2 of the Education Code.[27] The scope of a charter school's authority is further detailed in Section 12.102, titled "Authority Under Charter": An open-enrollment charter school "is governed under the governing structure described by the charter" and "retains authority to operate under the charter" assuming acceptable student performance.[28] But just as importantly, that section is also authority-limiting, itemizing what powers open-enrollment charter schools do *not* possess—namely, broad authority to impose taxes[29] and tuition.[30]

Put simply, open-enrollment charter schools wield many of the same powers as traditional public schools. They have stat-

19. *Id.* § 12.001(b).

20. *Id.* § 12.106(a) (A charter holder is entitled to receive funding for the open-enrollment charter school that is based in part on student "weighted daily attendance" and on "the state average tax effort."); *id.* § 12.106(b) ("An open-enrollment charter school is entitled to funds that are available to school districts from the agency or the commissioner in the form of grants or other discretionary funding unless the statute authorizing the funding explicitly provides that open-enrollment charter schools are not entitled to the funding."); *see id.* § 12.106(c) ("The commissioner may adopt rules to provide and account for state funding of open-enrollment charter schools under this section.").

21. *See id.* § 12.001(a).

22. *Id.*

23. *Id.* § 12.105.

24. *Id.* § 11.002.

25. *See id.* § 12.1053.

26. Tex. Civ. Prac. & Rem. Code § 101.001(3)(D).

27. Tex. Educ. Code § 12.104(a).

28. *Id.* § 12.102.

29. *Id.* § 12.102(4) (An open-enrollment charter school "does not have authority to impose taxes.").

30. *Id.* § 12.108(a) ("An open-enrollment charter school may not charge tuition to an eligible student who applies under Section 12.117.").

utory entitlements to state funding [31] and to the same services that school districts receive; [32] they are generally subject to "state laws and rules governing public schools"; [33] and they are subject to the "specifically provided" provisions of and rules adopted under the Education Code.[34] Many specific provisions applicable to the educational programs of traditional public schools also apply to open-enrollment charter schools, including provisions relating to "the Public Education Information Management System," reading instruments and instruction, high school graduation, special education, bilingual education, prekindergarten programs, health and safety, and "public school accountability." [35]

Chapter 12 further subjects open-enrollment charter schools to a host of statutes that govern governmental entities outside the Education Code. For example, for purposes of the Government Code's regulation of open meetings and access to public information, "the governing body of an open-enrollment charter school [is] considered to be [a] governmental bod[y]." [36] Likewise, for purposes of the Government Code's and Local Government Code's regulation of government records, "an open-enrollment charter school is considered to be a local government" and its records

"are government records for all purposes under state law." [37] And lastly, under Section 12.1053, as noted above, an open-enrollment charter school is considered to be: (1) a "governmental entity" for purposes of Government Code and Local Government Code provisions relating to property held in trust and competitive bidding; (2) a "political subdivision" for purposes of Government Code provisions on procurement of professional services; and (3) a "local government" for purposes of Government Code provisions on authorized investments.[38]

In sum, numerous provisions of Texas law confer "status" upon and grant "authority" to open-enrollment charter schools. Their status as "part of the public school system of this state" [39]—and their authority to wield "the powers granted to [traditional public] schools" [40] and to receive and spend state tax dollars [41] (and in many ways to function as a governmental entity [42])—derive wholly from the comprehensive statutory regime described above. With this legislative backdrop in mind, we are confident that the Legislature considers Universal Academy to be an "institution, agency, or organ of government" under the Tort Claims Act [43] and thus entitled to take an interlocutory appeal here.[44]

---

31. *Id.* § 12.106(a) ("A charter holder is entitled to receive for the open-enrollment charter school funding under Chapter 42....").

32. *Id.* § 12.104(c) ("An open-enrollment charter school is entitled to the same level of services provided to school districts by regional education service centers.").

33. *Id.* § 12.103(a).

34. *Id.* § 12.103(b).

35. *Id.* § 12.104.

36. *Id.* § 12.1051.

37. *Id.* § 12.1052.

38. *See id.* § 12.1053.

39. *Id.* § 12.105.

40. *Id.* § 12.104(a).

41. *See id.* §§ 12.106, .107.

42. *See id.* § 12.1053.

43. *See* Tex. Civ. Prac. & Rem.Code § 101.001(3)(D).

44. We leave undecided the separate issue of whether Universal Academy is immune from suit. The Solicitor General of Texas—responding to our request for briefing from the

### D. Arguments Against "Governmental Unit" Status Fall Short.

C2 suggests that Universal Academy is not a "governmental unit" because it is a private institution and can engage in for-profit activities. This is unpersuasive. It is true that open-enrollment charter schools can be operated by private institutions or private entities.[45] However, Universal Academy cannot earn profits and direct those profits to shareholders as do private for-profit corporations, as the statute does not permit private for-profit corporations to operate open-enrollment charter schools. In this case, Universal Academy is run by a non-profit corporation organized under Texas law and quali-fying under Section 501(c)(3) of the Internal Revenue Code. As Section 12.101(a) provides, this non-profit organization is eligible to operate an open-enrollment charter school.[46] The open-enrollment charter granted to Universal Academy specifically states that the charter holder "shall take and refrain from all acts necessary to be and remain in good standing as an organization exempt from taxation under Section 501(c)(3)." Though C2 points out that Universal Academy subleased a portion of its facilities to a private prekindergarten school that charges tuition, nothing in the record suggests the proceeds went to anywhere but the operations of Universal Academy.[47]

State—contends that denying "governmental unit" status "would make little sense because the Legislature has expressly granted open-enrollment charter schools immunity from liability." It is true that Section 12.1056 of the Education Code, while not mentioning immunity from suit, specifies that open-enrollment charter schools are "immune from liability to the same extent as a school district." TEX. EDUC.CODE § 12.1056. Our holding today that Universal Academy is a "governmental unit" under the Tort Claims Act entitled to take an interlocutory appeal does not turn on Section 12.1056's mention of immunity from liability. While that provision, like several other Education Code provisions, implies legislative recognition of "governmental unit" status for open-enrollment charter schools, we reserve judgment on: (1) whether Universal Academy, while entitled to take an interlocutory appeal, also has immunity from suit; and more fundamentally (2) whether the Legislature in fact has the authority to confer (as opposed to waive) immunity, a common-law creature traditionally delimited by the judiciary. That said, the Solicitor General pivots on Section 12.1056's grant of immunity from liability to argue that if open-enrollment charter schools are *not* governmental units under the Tort Claims Act, then the Act does not apply. And if the Act does not apply, then an open-enrollment charter school's immunity from tort liability is never waived. And if immunity is never waived, then Section 12.1056 would suggest that open-enrollment charter schools are immune from all tort liability,

unique among all governmental entities in the State. The Solicitor General sees this as an illogical and surely unintended outcome—traditional public schools exposed to tort liability but charter schools exempt from it. We do not consider today the scope or effect of Section 12.1056, but assuming *arguendo* the Legislature can grant immunity from liability, it would seem odd for lawmakers to imbue open-enrollment charter schools with greater tort immunity than cities, counties, school districts, and other purely governmental entities. Again, we reserve judgment on Universal's immunity from suit, an issue not before us.

45. *See* TEX. EDUC.CODE § 12.101(a). Open-enrollment charter schools may be operated by any one of four eligible entities: a public institution of higher education, a governmental entity, a private or independent institution of higher education, or, in this case, a non-profit organization. *Id.*

46. *See id.* § 12.101(a)(3).

47. Further, more than 93% of Universal Academy's funding comes from the State of Texas, through per-pupil allotments similar to allotments paid to public independent school districts. *See id.* § 12.106. Universal Academy also receives federal funding and private donations, so the revenue from the sublease generates only a minuscule portion of Universal Academy's revenues.

Further, even though Universal Academy is in some sense a nonpublic entity, its activities are narrowly circumscribed by statute. Universal Academy has no authority to operate outside of the educational mandate contained in its governing statutory framework, its articles of incorporation, and its charter. A charter may be granted only if Universal "meets any financial, governing, and operational standards adopted by the commissioner under" Subchapter D of Chapter 12,[48] the subchapter governing open-enrollment charter schools. The Commissioner of Education may audit Universal Academy[49] and may revoke its charter for failure to satisfy generally accepted accounting standards of fiscal management or for failure to comply with its charter or Subchapter D.[50] Like all other open-enrollment charter schools, Universal Academy is required by law to "provide instruction to students at one or more elementary or secondary grade levels as provided by the charter."[51] Further, Universal Academy's articles of incorporation state that "[t]he corporation is organized exclusively for the following purpose: the non profit operation of an open-enrollment charter school which shall be operated for educational purposes."

Universal Academy's use of state-funded property and state funds is also carefully circumscribed. Property purchased or leased with state public funds—the source of more than 93% of Universal Academy's funding—is held in trust for the benefit of the students [52] and "may be used only for a purpose for which a school district may use school district property."[53] In other words, if traditional public schools can rent their facilities to private groups—like to churches for Sunday services or to dance studios for ballet recitals—then so can charter schools.[54] Likewise, open-enrollment charter schools may spend state funds only in the manner that public schools may spend such funds,[55] and such funds are also held in trust for the benefit of the students.[56]

The dissent, however, maintains that Universal Academy lacks "governmental unit" status because, while the overall charter-school regime is set forth by statute, it is the State Board of Education (SBOE) that issues charters and the Commissioner of Education who revokes or denies renewal.[57] That is, the dissent views open-enrollment charter schools as creatures of a state agency, not the state legislature.[58] Because "specific charter schools are not mentioned"—one by one—in statute, "they therefore do not derive status as governmental units" under Sec-

---

48. *Id.* § 12.101(b); *see also id.* § 12.113(a)(1).

49. *Id.* § 12.1163(a)(1). The Commissioner also has the power to audit the records of the charter holder and any management company that provides management services to the school. *See id.* §§ 12.1163(a)(1)–(2), .1012.

50. *Id.* § 12.115. Whether Universal Academy complied with statutory accountability and financial standards is not before us today.

51. *Id.* § 12.102(1).

52. *Id.* § 12.128(a)(2).

53. *Id.* § 12.128(a)(3).

54. *See id.; see also id.* § 45.033. Under Chapter 45, which covers school district funding, the governing board of a school district "may set and collect rentals, rates, and charges from students and others for the occupancy or use of any of the facilities, in the amounts and manner determined by the board...."

55. *Id.* § 12.107(a)(3).

56. *Id.* § 12.107(a)(2).

57. 342 S.W.3d 73, 84.

58. *Id.* at 87.

tion 101.001(3)(D) of the Tort Claims Act.[59] In other words, unless and until our biennial Legislature passes statutes that identify each open-enrollment charter school by name, a school can never achieve "governmental unit" status under Subsection (3)(D).[60] This argument is textually untenable.

True enough, a charter school cannot operate without a charter. And charters are granted by the SBOE, not by 181 legislators sifting through mounds of applications.[61] But that does not mean a charter school's status and authority derive from administrative as opposed to legislative action. The dispositive issue is not who grants a charter but who grants a charter *meaning*. Who bestows the status and authority that a charter brings; what does having a charter mean, and who says so? The wellspring of open-enrollment charter schools' existence and legitimacy is the Education Code and its multiplicity of provisions that both detail and delimit what these public schools can and cannot do. The SBOE can issue no charters absent the Education Code,[62] which dictates the requirements for charter eligibility[63] and details with precision what powers are conferred.[64] The "powers" of an open-enrollment charter school derive from statute;[65] likewise its "authority to operate under the charter"[66] (along with limitations upon that authority[67]); same for its "[s]tatus."[68] All emanate from legislative command. The Legislature has tasked the SBOE and the Texas Education Agency with certain day-to-day duties, but the fact that non-legislators have been delegated such tasks does not obscure the all-encompassing legislative regime that called charter schools into existence and that defines

59. *Id.* at 87.

60. *Id.* at 88. The dissent sees two narrow paths to "governmental unit" status for privately run open-enrollment charter schools: (1) under Subsection (3)(B), if such schools are added as a general category of "political subdivision" like junior college districts, or (2) under Subsection (3)(D), if each school has its existence statutorily declared, like each of our State's various public universities. *Id.* As explained above, this constrained view lacks any textual support, and we decline to graft this ancillary requirement onto the Legislature's straightforward definition of "governmental unit" in Subsection (3)(D).

61. TEX. EDUC.CODE § 12.101 (providing that the SBOE "may grant a charter for an open-enrollment charter school only to an applicant that meets any financial, governing, and operational standards adopted by the commissioner").

62. *Id.* § 12.113.

63. *Id.* § 12.101(a).

64. *See id.* § 12.102 (titled "Authority Under Charter"). The Education Code is the authority for these charter agreements; it defines

the scope of their content and limits their effect on future renewals. Section 12.111, titled "Content," says that "each charter granted under this subchapter must" include, among other things, the period of the charter's validity, the conditional nature of its renewal, the minimum level of student performance, and the basis for revoking a charter. *Id.* § 12.111. Furthermore, "[t]he grant of a charter under [Subchapter D] does not create an entitlement to a renewal of a charter on the same terms as it was originally issued." *Id.* § 12.113(b).

65. *Id.* § 12.104(a) (Open-enrollment charter schools have "the powers granted to [traditional public] schools" under Title 2 of the Education Code.).

66. *Id.* § 12.102(3).

67. *See id.* § 12.102(4) (An open-enrollment charter school "does not have authority to impose taxes."); *see also id.* § 12.108(a) ("An open-enrollment charter school may not charge tuition to an eligible student who applies under Section 12.117.").

68. *Id.* § 12.105 (titled "Status").

their role in our public-education system.[69] The Legislature's own pronouncements declare the status and authority of open-enrollment charter schools. Other state entities and officials may exercise a measure of oversight pursuant to those statutory commands, but the commands themselves, and that they are legislative, are what matter most.

## III. Conclusion

Open-enrollment charter schools are governmental units for Tort Claims Act purposes because: (1) The Act defines "governmental unit" broadly to include "any other institution, agency, or organ of government" derived from state law;[70] (2) the Education Code defines open-enrollment charter schools as "part of the public school system,"[71] which are "created in accordance with the laws of this state,"[72] subject to "state laws and rules governing public schools,"[73] and, together with traditional public schools, "hav[ing] the primary responsibility for implementing the state's system of public education;"[74] and (3) the Legislature considers open-enrollment charter schools to be "governmental entit[ies]"[75] under a host of other laws outside the Education Code.

Accordingly, because Universal Academy is a "governmental unit" under the Tort Claims Act, the court of appeals had jurisdiction to hear Universal Academy's interlocutory appeal under Section 51.014(a)(8).[76] Our holding does not resolve the underlying issue of whether Universal Academy enjoys immunity from C2's contract claim. We reverse the court of appeals' judgment dismissing the appeal and remand to that court for further proceedings.

Justice GUZMAN delivered a dissenting opinion, in which Chief Justice JEFFERSON and Justice MEDINA joined.

Justice GUZMAN, joined by Chief Justice JEFFERSON and Justice MEDINA, dissenting.

A party's ability to take an interlocutory appeal is a limited exception to the general rule that only final orders are appealable. As applicable here, the contours of that exception are found in sections 51.014(a)(8) and 101.001(3) of the Civil Practice and Remedies Code. Despite these limits, the Court embarks on a perilous expedition through the Education Code in an attempt to locate some indicia that the Legislature intended to allow privately run, open-enrollment charter schools to take this circumscribed form of appeal. In so doing, the Court ventures beyond the narrow procedural question presented in this case: whether a privately run, open-enrollment charter school is a "governmental unit" as defined by section 101.001(3) of the Civil Practice and Remedies Code. If it is, then an interlocutory appeal is proper from de-

---

69. *Edgewood Indep. Sch. Dist. v. Meno,* 917 S.W.2d 717, 730 n. 8 (Tex.1995) ("As long as the Legislature establishes a suitable regime that provides for a general diffusion of knowledge, the Legislature may decide whether the regime should be administered by a state agency, by the districts themselves, or by any other means.").

70. *See* Tex. Civ. Prac. & Rem.Code § 101.001(3)(D).

71. Tex. Educ.Code § 12.105.

72. *Id.* § 11.002.

73. *Id.* § 12.103(a).

74. *Id.* § 11.002.

75. *Id.* § 12.1053; *see also id.* §§ 12.1051–.1052.

76. *See* Tex. Civ. Prac. & Rem.Code § 51.014(a)(8).

nial of a plea to the jurisdiction by the school, as authorized by section 51.014(a)(8). But, because it is not, I would affirm the court of appeals. Privately run, open-enrollment charter schools do not meet the Legislature's definition as set out in section 101.001(3), and therefore no interlocutory appeal may be taken from an order granting or denying a plea to the jurisdiction by such a school.

Moreover, not only does the Court allow for an interlocutory appeal that is contrary to the expressed intent of the Legislature, the Court has also effectively answered an important substantive question that is not before us: what type of immunity does a privately run, open-enrollment charter school possess? Specifically, do such schools: (1) possess governmental immunity from suit, (2) merely have immunity from liability, or (3) lack immunity entirely? The Court's reasoning, while masquerading as an answer to the narrow procedural issue before us, portends to address the merits of this immunity question. By doing so, the Court provides courts below with a signal that such schools possess immunity from suit. As a result, a private, nonprofit corporation can take on the mantle of governmental immunity, leaving other litigants wrongfully deprived of their day in court and without an opportunity to have this issue addressed through the rigors of our adversarial system. Accordingly, I must respectfully dissent.

## I. Interlocutory Appeal Under Section 51.014(a)(8)

LTTS Charter School, Inc. (LTTS), is a private, nonprofit corporation, operating an open-enrollment charter school. LTTS does so under authority of a charter issued by the State Board of Education, pursuant to the charter school regime established by Chapter 12 of the Education Code. It is being sued by C2 Construction for breach of contract relating to the construction of new facilities. LTTS filed a plea to the jurisdiction, asserting governmental immunity. The trial court denied that plea, and when LTTS attempted an interlocutory appeal, the court of appeals dismissed its appeal for lack of jurisdiction, holding that LTTS is not a governmental unit under section 101.001(3). 288 S.W.3d 31, 38.

Civil Practice and Remedies Code section 51.014(a)(8) allows immediate appeal of an order denying or granting a plea to the jurisdiction by a governmental unit and, in doing so, incorporates by reference section 101.001(3)'s definition of what constitutes a governmental unit. TEX. CIV. PRAC. & REM.CODE § 51.014(a)(8). In construing section 51.014, it is "the Legislature's intent that section 51.014 be strictly construed as a narrow exception to the general rule that only final judgments and orders are appealable." *Bally Total Fitness Corp. v. Jackson,* 53 S.W.3d 352, 355 (Tex.2001) (quotation marks omitted). LTTS asserts that it is a "governmental unit" for purposes of section 51.014(a)(8) under two provisions found in section 101.001(3). Specifically, LTTS argues that it is a governmental unit both as a "school district" under section 101.001(3)(B), and also as "any other institution, agency, or organ of government" as provided by section 101.001(3)(D).[1]

---

1. As relevant here, section 101.001(3) defines a "governmental unit" as:

(B) a political subdivision of this state, including any city, county, school district, junior college district, levee improvement district, drainage district, irrigation district, water improvement district, water control and improvement district, water control and preservation district, freshwater supply district, navigation district, conservation and reclamation district, soil conservation district, communication district, public health district, and river authority;

. . . .

## II. Privately Run, Open–Enrollment Charter Schools Are Not Governmental Units

### A. "Any Other Institution, Agency, or Organ of Government" Under Section 101.001(3)(D) and "School District" Under Section 101.001(3)(B)

The Court holds that LTTS is a governmental unit under section 101.001(3)(D), concluding it qualifies as "any other institution, agency, or organ of government the status and authority of which are derived from the Constitution of Texas or from laws passed by the legislature under the constitution." TEX. CIV. PRAC. & REM.CODE § 101.001(3)(D). The first part of that definition, "any other institution, agency, or organ of government," appears quite broad. But that apparent breadth is circumscribed by the language that follows: "status and authority of which are derived from the Constitution of Texas or from laws passed by the legislature under the constitution." The linchpin of section 101.001(3)(D) is the word "derive." "Derive" means "to receive or obtain from a source or origin." RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 536 (2d ed.1987). The plain language of section 101.001(3)(D) thus covers only two classes of governmental entities: those whose status and authority comes directly from our Constitution, and those whose status and authority is received or obtained by a legislative enactment. See TEX. CIV. PRAC. & REM.CODE § 101.001(3)(D).

Unquestionably, LTTS does not derive its status from the Constitution. We therefore examine whether it falls within the other class of entities covered by section 101.001(3)(D)—those whose status and authority is conferred by a legislative enactment. LTTS does not fall within that class either, because it does not obtain or receive status or authority from any statute or other enactment. Rather, its status is derived from a charter granted by the State Board of Education. See TEX. EDUC. CODE §§ 12.101, .113. If LTTS's charter is revoked, or if the commissioner of education denies its renewal, see id. §§ 12.115, .116, LTTS will cease to have any kind of governmental status and will simply be a private, nonprofit corporation. See id. § 12.1161(a) ("[I]f the commissioner revokes or denies the renewal of a charter of an open-enrollment charter school ... the school may not: (1) continue to operate under this subchapter; or (2) receive state funds under this subchapter."). In point of fact, although the Education Code authorizes the State Board of Education to grant charters, it does not itself grant them to any particular entities. Therefore, LTTS does not derive its status or authority from any legislative enactment.

LTTS also asserts that it is a governmental unit under section 101.001(3)(B) as a "political subdivision, specifically, a school district." The Court does not reach that question. I would hold that the plain meaning of "school district" does not cover a privately operated, open-enrollment charter school. A school district is a "political subdivision," TEX. CIV. PRAC. & REM. CODE § 101.001(3)(B), exercising "jurisdiction over a portion of the State," Guar. Petroleum Corp. v. Armstrong, 609 S.W.2d 529, 531 (Tex.1980). Rather than exercising jurisdiction, an open-enrollment charter school "provide[s] instruction to students at one or more" locations, and "does not have authority to impose taxes." TEX. EDUC.CODE § 12.102(1), (4). Furthermore, the Legislature, far from defining charter schools as school districts, generally goes

(D) any other institution, agency, or organ of government the status and authority of which are derived from the Constitution of Texas or from laws passed by the legislature under the constitution.

TEX. CIV. PRAC. & REM.CODE § 101.001(3)(B), (D).

to great lengths in the Education Code to list each separately, a clear indication that a charter school is not equivalent to a school district. *See, e.g., id.* § 7.009.

Rather than employing this strict textual analysis to determine whether the requirements of section 101.001(3) are met, the Court largely ignores the statutory text and instead meanders through a wide-ranging consideration of Chapter 12 of the Education Code. Seeking to buttress its conclusion, the Court cites sections of the Education Code that generally describe how open-enrollment charter schools operate, but are irrelevant to the narrow procedural issue before us. The Court thus mistakenly focuses only on the inclusive, general part of the definition "institution, agency, or organ of government," while disregarding the limiting language "status and authority of which are derived ... from laws passed by the legislature under the constitution." TEX. CIV. PRAC. & REM. CODE § 101.001(3)(D), thereby rendering meaningless the limiting language in that section and thwarting the Legislature's intent. The Court is also oblivious to the rule that interlocutory appeals are disfavored, and that section 51.014 is to be strictly construed accordingly. *See Bally Total Fitness,* 53 S.W.3d at 355.

The Court makes a bold but brief effort to identify legislative enactments that confer status and authority on LTTS under section 101.001(3)(D). It particularly cites sections 12.104 and 12.105 of the Education Code, asserting that charter schools derive authority and status respectively from those enactments. But section 12.104 does not confer authority on LTTS, or on any other charter school. *See* TEX. EDUC.CODE § 12.104. It merely provides that charter schools have the same powers as public schools under Title 2 of the Education Code. *See id.* Whether a particular entity like LTTS *is* an open-enrollment charter school, and is thus able to avail itself of those powers, is entirely dependent on the grant of a charter from the State Board of Education. *See id.* §§ 12.101, .113. Section 12.105 likewise does not confer status on LTTS, or any other charter school, but instead provides that open-enrollment charter schools are part of the public school system. *See id.* § 12.105. As with section 12.104, whether any particular entity is an open-enrollment charter school— and hence part of the public school system—depends on the grant of a charter from the State Board of Education.

The Court also cites Education Code section 12.1053 as conferring governmental status on open-enrollment charter schools. But, in addition to the fact that it does not confer status for the reasons discussed above, an examination of section 12.1053 demonstrates a clear intent to only apply very specific definitions and provisions from the Government and Local Government Codes to charter schools. It defines open-enrollment charter schools as (1) "governmental entit[ies]" under subchapter D, Government Code Chapter 2252 (providing that real property is held in trust); (2) "governmental entit[ies]" under subchapter B, Local Government Code Chapter 271 (addressing competitive bidding on certain public works contracts); (3) "political subdivision[s]" under subchapter A, Government Code Chapter 2254 (governing professional services contracts); and (4) "local government" under Government Code sections 2256.009 to 2256.016 (regulating authorized investments). TEX. EDUC.CODE § 12.1053. None of those four definitions is the same as " 'governmental unit' under Civil Practice and Remedies Code section 101.001(3)," which is, after all, the inquiry here.

Finally, the Court notes that "[s]everal statutes discuss the authority that open-enrollment charter schools may exercise

*under* their charters." 342 S.W.3d 73 (emphasis added). But this merely underscores the flaw in the Court's reasoning: open-enrollment charter schools derive status and authority *under* the charters granted to them by the State Board of Education, not from any legislative enactment.

This is not to say that the Legislature could never allow a privately run, open-enrollment charter school like LTTS to take an interlocutory appeal. And, contrary to the Court's understanding, I am not suggesting that only a legislative enactment specifically naming each charter school would suffice, or that the Legislature must approve each charter application. 342 S.W.3d 73. Rather, had the Legislature chosen to do so, it could readily have provided for interlocutory appeals by open-enrollment charter schools *as a class*. For example, it could have amended the interlocutory appeal statute. *Cf.* Tex. Civ. Prac. & Rem.Code § 51.014(a)(6) (authorizing interlocutory appeal from an order denying a motion for summary judgment "based in whole or in part upon a claim against or defense by a member of the electronic or print media"). But, the Legislature did not so choose. *Cf. Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 463 (Tex.2009) (Willett, J., concurring) (citation omitted) ("[T]he 'surest guide' to what lawmakers intended is what lawmakers enacted."). Nor is this to say that an interlocutory appeal would always be improper for a *publicly* run, open-enrollment charter school—such a school would likely be a governmental unit independent of its charter.[2] But LTTS is not a publicly run school, and the Legislature simply has not granted privately run, open-enrollment charter schools a right to interlocutory

appeal. The Court errs in granting them that right today.

### B. Comparison to Public Universities and Junior College Districts

The Legislature's treatment of public universities and junior colleges under section 101.001(3) illustrates the actual manner in which the Legislature designates entities as governmental units under that section, and further highlights the flaw in the Court's reasoning. Specifically, junior college districts are governmental units under section 101.001(3)(B) because they are listed in that subsection, whereas public universities are governmental units under section 101.001(3)(D) because their authority and status is conferred by legislative enactments.

Civil Practice and Remedies Code section 101.001(3)(B) includes "junior college district[s]," as well as school districts, in its enumeration of entities that are governmental units. Tex. Civ. Prac. & Rem.Code § 101.001(3)(B). By contrast, public universities are treated differently from both junior colleges and charter schools. Although, like charter schools, they are not listed anywhere in section 101.001(3), public universities nevertheless satisfy the precise standards articulated by section 101.001(3)(D), which requires that an entity's governmental status be "derived from ... laws passed *by the legislature.*" *Id.* § 101.001(3)(D) (emphasis added). The extensive provisions of Title III of the Education Code, entitled "Higher Education," confer status and authority on the various public universities of this state. *See, e.g.,* Tex. Educ.Code § 67.02 ("The University of Texas at Austin is a coeducational institution of higher education within The University of Texas System."); *id.*

---

2. Chapter 12 of the Education Code provides that charters can be granted not only to private entities, but also to public institutions of

higher learning, and other governmental entities. Tex. Educ.Code § 12.101(a)(1), (4).

§§ 109.001, .01 (establishing the Texas Tech University System and providing that Texas Tech University "is a coeducational institution of higher education located in the city of Lubbock").

Unlike public universities, specific charter schools are not mentioned in the Education Code, nor any other statute, and they therefore do not derive status as governmental units from legislation, as section 101.001(3)(D) requires. Rather, like junior colleges, the Legislature has provided administrative procedures for their creation, but has not actually conferred status on them itself. See id. §§ 130.011–.013 (providing for establishment of junior college districts by joint action of the coordinating board, commissioner of higher education, and the independent school district or city that wishes to establish a junior college district); id. §§ 12.101, .113 (authorizing the State Board of Education to grant charters).[3] But, unlike junior colleges, charter schools are *not* among the entities enumerated in Civil Practice and Remedies Code section 101.001(3). The Court largely ignores the rest of section 101.001(3) in its analysis, focusing almost entirely on subsection (D). But, in construing a statute, "[w]e determine legislative intent from the entire act and not just isolated portions." *20801, Inc. v. Parker*, 249 S.W.3d 392, 396 (Tex.2008).

Accordingly, I would conclude that privately run, open-enrollment charter schools such as LTTS do not fall within the plain language of section 101.001(3)(D), because they gain and lose their status and authority through agency actions, not by legislative enactments. I would also con-clude that they are not "school districts," and therefore are not governmental units under section 101.001(3)(B). Thus, I would hold that LTTS is not entitled to an interlocutory appeal under section 51.014(a)(8).

## III. The Court Effectively Answers a Substantive Question Not Before Us

The Court's reasoning further effectively answers a question not before us today—that is, whether privately run, open-enrollment charter schools like LTTS possess governmental immunity from suit. Although the Court professes to reserve judgment on this issue, the reasoning of the Court's opinion appears to be animated by a concern raised by the Solicitor General. See 342 S.W.3d 73 n. 44. The Solicitor General asserts that it would be "illogical" to hold that open-enrollment charter schools are not governmental units under section 101.001(3)(D), because if they are not, the waiver in the Tort Claims Act allegedly would not apply. In other words, charter schools would be governmental entities that enjoy immunity from suit in the first instance, but they would not be "governmental units" under section 101.001(3), for which certain immunity is waived by the Tort Claims Act. The Solicitor General further reasons that such a result would leave charter schools entirely immune from tort claims, whereas school districts' immunity is waived by the Act.

The Court endorses this reasoning. 342 S.W.3d 73 n. 44. ("[A]ssuming arguendo the Legislature can grant immunity from liability, it would seem odd for lawmakers to imbue open-enrollment charter schools

---

**3.** Junior college districts are by no means unique in this respect. Similarly, for example, water improvement districts derive their authority from local governments, not the Legislature, and, like junior colleges—but unlike charter schools—they are listed in section 101.001(3). See Tex. Water Code §§ 55.021– .053 (establishing rules and procedures by which local governments may create water improvement districts); Tex. Civ. Prac. & Rem. Code § 101.001(3)(B) (defining governmental unit as "a political subdivision of this state, including any … water improvement district").

with greater tort immunity than cities, counties, school districts, and other purely governmental entities."). But the Solicitor General's argument fails for a multitude of reasons. First, public school districts themselves possess near complete immunity under the Tort Claims Act,[4] thus proving the argument that the Legislature could not have intended to treat public schools and privately run, open-enrollment charter schools disparately to be a non-sequitur. There is no parade of horribles that would result from holding that private charter schools are not governmental units under section 101.001(3), even if this meant they possessed complete immunity. Only a narrow group of tort actions would be affected.

Second, as discussed above, the Court avoids the question of whether an open-enrollment charter school is a "school district" today, but we will inevitably face this issue in the future. If open-enrollment charter schools do possess immunity from suit, as the Court's opinion suggests, it follows that the only way immunity would be waived for contract claims such as those brought here would be through the contract-claims waiver in Local Government Code section 271.152. And that waiver would most likely apply to privately run, open-enrollment charter schools only if such schools are "school districts," which, as previously explained, they are not. This is because the definition of "local governmental entity" to which that waiver applies contains no catch-all provi-

sion equivalent to section 101.001(3)(D). *See* TEX. LOC. GOV'T CODE § 271.151(3). Rather, it is limited to a list of entities nearly identical to those found in section 101.001(3)(B). Both definitions cover the following entities: (1) city or municipality, (2) school district or junior college district, and (3) "levee improvement district, drainage district, irrigation district, water improvement district, water control and improvement district, water control and preservation district, freshwater supply district, navigation district, conservation and reclamation district, soil conservation district, communication district, public health district, and river authority." *Compare id.* § 271.151(3)(A)–(C), *with* TEX. CIV. PRAC. & REM.CODE § 101.001(3)(B). The only substantive difference between the two is that section 271.151(3) excludes counties, while section 101.001(3)(B) includes them. *Compare* TEX. LOC. GOV'T CODE § 271.151(3), *with* TEX. CIV. PRAC. & REM.CODE § 101.001(3)(B). Section 271.152's waiver is therefore limited to the same governmental units that fall under section 101.001(3)(B), with the exception of counties. And because open-enrollment charter schools are not included in section 271.152's list of entities, they also would not fall within its waiver of immunity.[5]

Third, given that an open-enrollment charter school's very existence as a public school is dependent on an agency's grant of a charter, and is subject to revocation at the whim of an agency, it is unclear what the effect of a charter revocation mid-suit

---

4. School districts as a practical matter are almost entirely immune—the Tort Claims Act *excludes* them from its waiver "[e]xcept as to motor vehicles." TEX. CIV. PRAC. & REM.CODE § 101.051; *see also Hopkins v. Spring Indep. Sch. Dist.,* 736 S.W.2d 617, 619 (Tex.1987) (holding school district immune from suit for injuries suffered by a student aboard a school bus, because the injuries did not result from the "operation" or "use" of the bus).

5. Notably, although Education Code section 12.1053 makes subchapter B (covering competitive bidding on certain public works contracts) of Local Government Code Chapter 271 applicable to open-enrollment charter schools, it *does not apply* subchapter I (which includes the waiver provisions found in sections 271.151 and 271.152) to them. *See* TEX. EDUC.CODE § 12.1053.

would have on the school's supposed immunity under the Court's reasoning. Would the school retain immunity, even though it was no longer a governmental unit? Or would the school immediately lose immunity, even though sued for events occurring while a charter school? And what if a private nonprofit corporation operating a charter school were sued on a basis removed from its provision of education services? Would that private corporation enjoy immunity simply because it operated a charter school? These sorts of difficult questions deserve the opportunity for consideration and debate in our adversarial system, and further illustrate the infirmity of the Court's implicit reaching of the substantive issue not before us.

Finally, such reasoning simply begs the question of whether privately run, open-enrollment charter schools are immune at all. It is far from clear that the Legislature can confer immunity upon private entities like LTTS. Sovereign immunity (and by extension, governmental immunity, which is derived from it) is a common-law doctrine of the courts. *See Tooke v. City of Mexia*, 197 S.W.3d 325, 331 (Tex.2006). Generally, the Legislature's role is limited to waiving immunity, while recognition of immunity's existence is left to the courts. *See id.* at 331–32 (noting that the Court has long upheld the rule of sovereign immunity, while deferring to the Legislature to waive it). Indeed, after a review of the doctrine's foundations, we concluded that "it remains the judiciary's responsibility to define the boundaries of the ... doctrine and *to determine under what circumstances sovereign immunity exists in the first instance.*" *Reata Constr. Co. v. City of Dallas*, 197 S.W.3d 371, 375 (Tex.2006)

(emphasis added); *see also City of Galveston v. State*, 217 S.W.3d 466, 475 (Tex. 2007) (Willett, J., dissenting) ("The Legislature's focus is critical but confined; its role is limited to waiving *pre-existing* common-law immunity."). We further noted that "[s]overeign immunity is a common-law doctrine that initially developed without any legislative or constitutional enactment." *Reata*, 197 S.W.3d at 374. In part for policy reasons, we defer to the Legislature to *waive* such immunity as has been recognized by the courts. *See id.* at 375 ("We have generally deferred to the Legislature to waive immunity because the Legislature is better suited to address the conflicting policy issues . . . ."). Our sovereign immunity jurisprudence therefore suggests, at least as a general matter, that courts create or recognize sovereign immunity, while the Legislature waives it.[6]

It is true that there are some forms of *statutory* immunity. *See, e.g., Franka v. Velasquez*, 332 S.W.3d 367, 371 n. 9 (Tex. 2011) (holding that section 101.106 of the Civil Practice and Remedies Code confers immunity in some instances to employees of governmental units); *Entergy Gulf States*, 282 S.W.3d at 436 (noting that general contractors have limited immunity as "statutory employers" under Texas Labor Code section 408.001(a)). But the precise contours of the Legislature's power to grant immunity by statute remain unclear—it is no doubt limited by the Open Courts and Due Course of Law provisions of our Constitution. It may be constitutionally significant that both of the above examples involve special circumstances that limit the breadth of the immunity in question. In the first, the government is

---

6. Significantly, we have also reserved the possibility that, having created sovereign immunity, the judiciary "may modify or abrogate such immunity by modifying the common law," *Reata*, 197 S.W.3d at 375, though we

have cautioned that courts should not lightly set aside immunity, once recognized, as doing so "could become a ruse for avoiding the Legislature," *City of Galveston*, 217 S.W.3d at 471.

simply extending its own immunity to its employees (in a manner largely coterminous with governmental immunity for acts of government employees within their official capacity). *See Franka,* 332 S.W.3d at 371 n. 9. In the second, a limited form of immunity is extended in conjunction with a comprehensive workers' compensation scheme, one designed to provide an alternative form of compensation to the traditional tort remedies in some cases. That immunity, unlike sovereign immunity, does not entirely preclude a plaintiff's recovery, it merely limits recovery to the statutory scheme. *See HCBeck, Ltd. v. Rice,* 284 S.W.3d 349, 350 (Tex.2009). It is also an affirmative defense, not a bar to jurisdiction. *See id.* Furthermore, there is a question as to whether the Legislature can delegate to an agency the power to confer immunity upon separate private entities.

In sum, it is unsettled whether the Legislature has the power to confer immunity from suit on privately operated, open-enrollment charter schools via the statutory scheme in question. But, leaving aside that thorny issue, the only legislative act that addresses immunity for open-enrollment charter schools narrowly provides that they are "immune from *liability* to the same extent as a school district." Tex. Educ.Code § 12.1056 (emphasis added). Immunity from liability is not the same as immunity from suit. *Tooke,* 197 S.W.3d at 332. The former "bars enforcement of a judgment against a governmental entity," *id.,* while only the latter is the basis for a plea to the jurisdiction, *see id.; Tex. Dep't of Parks & Wildlife v. Miranda,* 133 S.W.3d 217, 225–26 (Tex.2004). The plain meaning of section 12.1056 therefore gives no indication that LTTS is immune from suit, independent of whether it is immune from liability, and as such provides no basis for a plea to the jurisdiction. In other words, regardless of whether the Legislature has the power to confer immu-

nity from suit in this case, section 12.1056 does not suffice to do so, making it anything but a foregone conclusion that privately operated, open-enrollment charter schools have immunity from suit.

Despite these unsettled questions, the Court's reasoning will strongly imply to our state's lower courts that we have already determined that privately run, open-enrollment charter schools are immune from suit. Indeed, nearly all of the Court's analysis would be more properly addressed to the merits of LTTS's assertion of immunity, rather than the narrow procedural question that is actually before us. I fear that the Court's approach will effectively deprive litigants of their day in court to properly contest whether privately run, open-enrollment charter schools in fact have immunity from suit. We should not predetermine this important decision now, but should wait until it is squarely presented to this Court, and we should decide it explicitly, not by implication.

## IV. Conclusion

Because (1) the plain meaning of Civil Practice and Remedies Code section 101.001(3) does not cover a privately run, open-enrollment charter school like LTTS, and (2) the Court has effectively resolved the underlying substance of whether such schools enjoy immunity from suit, rather than the procedural issue properly before us, I respectfully dissent, and would affirm the court of appeals' holding that it lacked jurisdiction over this interlocutory appeal.