# Supreme Court of Texas

====

No. 22-0056

====

CPS Energy,

*Petitioner*,

v.

Electric Reliability Council of Texas,

*Respondent*

====

On Petition for Review from the
Court of Appeals for the Fourth District of Texas

====

*~and~*

Electric Reliability Council of Texas, Inc.,

*Petitioner*,

v.

Panda Power Generation Infrastructure Fund, LLC d/b/a Panda Power Funds; Panda Sherman Power Holdings, LLC; Panda Sherman Power Intermediate Holdings I, LLC; Panda Sherman Power Intermediate Holdings II, LLC; Panda Sherman Power, LLC; Panda Temple Power Holdings, LLC; Panda Temple Power Intermediate Holdings I, LLC; Panda Temple Power Intermediate Holdings II, LLC; Panda Temple Power, LLC; Panda Temple Power II Holdings, LLC; Panda Temple Power II Intermediate Holdings I, LLC; Panda Temple Power II Intermediate Holdings II, LLC; and Panda Temple Power II, LLC,

*Respondents*

On Petition for Review from the
Court of Appeals for the Fifth District of Texas

**Argued January 9, 2023**

CHIEF JUSTICE HECHT delivered the opinion of the Court, in which Justice Blacklock, Justice Bland, Justice Huddle, and Justice Young joined, and in which Justice Lehrmann, Justice Boyd, Justice Devine, and Justice Busby joined except as to Part IV.

JUSTICE BOYD and JUSTICE DEVINE filed a dissenting opinion, in which Justice Lehrmann and Justice Busby joined.

These two cases present three questions concerning the Electric Reliability Council of Texas, Inc.: (1) Is ERCOT a governmental unit as defined in the Texas Tort Claims Act and thereby entitled to pursue an interlocutory appeal from the denial of a plea to the jurisdiction? (2) Does the Public Utility Commission of Texas have exclusive jurisdiction over the parties' claims against ERCOT? And (3) is ERCOT entitled to sovereign immunity? The answer to all three questions is yes. In No. 22-0056,[1] we affirm the court of appeals' judgment[2] dismissing the claims against ERCOT. In No. 22-0196,[3] we reverse the court of appeals' judgment[4] and render judgment dismissing the claims against ERCOT.

## I

"In its electrical grid, as in so many things, Texas stands alone."[5] Most of the state comprises the U.S. mainland's only *intra*state electrical grid,[6] which covers 75 percent of the state's acreage, carries about 90 percent of its electrical load, and includes more than 52,700 miles of transmission lines, 1,100 generation units, and 26 million electricity

---

[1] *CPS Energy v. Electric Reliability Council of Tex.*

[2] 648 S.W.3d 520 (Tex. App.—San Antonio 2021).

[3] *Electric Reliability Council of Tex., Inc. v. Panda Power Generation Infrastructure Fund, LLC.*

[4] 641 S.W.3d 893 (Tex. App.—Dallas 2022) (en banc).

[5] *Texas v. EPA*, 829 F.3d 405, 431 (5th Cir. 2016).

[6] *See New York v. FERC*, 535 U.S. 1, 7 (2002) ("It is only in Hawaii and Alaska and on the 'Texas Interconnect'—which covers most of that State—that electricity is distributed entirely within a single State.").

customers.[7] The Public Utility Regulatory Act (PURA) requires the Public Utility Commission (PUC) to certify an independent system operator (ISO) for the Texas power region.[8] The PUC certified ERCOT, a membership-based 501(c)(4) nonprofit corporation.[9]

ERCOT was formed in 1970 by various Texas electric utilities that had interconnected their grids for greater reliability and increased capacity.[10] Membership was "available to any electric utility [that] own[ed], control[led] or operate[d] an electric power system in Texas".[11] In those days, each member utility operated its own control area, and ERCOT served an administrative role that "promote[d] reliable operations of power systems in Texas by providing a means to

[7] *Oncor Elec. Delivery Co. v. Pub. Util. Comm'n*, 507 S.W.3d 706, 708 n.1 (Tex. 2017); *ERCOT Organization Backgrounder*, ERCOT, https://www.ercot.com/news/mediakit/backgrounder (last visited June 15, 2023); *Fact Sheet*, ERCOT (June 8, 2023), https://www.ercot.com/files/docs/2022/02/08/ERCOT_Fact_Sheet.pdf.

[8] TEX. UTIL. CODE § 39.151(a), (c). The Texas power region is also known as ERCOT. *See id.* § 31.002(5) (defining ERCOT as "the area in Texas served by electric utilities, municipally owned utilities, and electric cooperatives that is not synchronously interconnected with electric utilities outside the state"). To avoid confusion, we refer to the nonprofit corporation that is party to these cases as ERCOT and the area served by the interconnected grid as the Texas power region.

[9] 16 TEX. ADMIN. CODE § 25.361; *ERCOT Organization Backgrounder*, *supra* note 7.

[10] *See W. Tex. Utils. Co. v. Tex. Elec. Serv. Co.*, 470 F. Supp. 798, 808-809 (N.D. Tex. 1979); Jared M. Fleisher, *ERCOT's Jurisdictional Status: A Legal History and Contemporary Appraisal*, 3 TEX. J. OIL GAS & ENERGY L. 4, 10-11 (2008).

[11] *W. Tex. Utils. Co.*, 470 F. Supp. at 808.

communicate and coordinate the planning and operation of its members."[12]

In 1999, the Legislature restructured the electric utility industry in Texas.[13] It amended PURA to require the "[u]nbundling" of vertically integrated electric utility monopolies and established a fully competitive electric power industry.[14] The new structure required an ISO to operate the wholesale electric market and "ensure the reliability and adequacy" of the Texas power grid.[15] Since 2001, ERCOT has served as that "[e]ssential [o]rganization[]".[16]

The two cases before us stem from different facts and different parties, but they raise overlapping jurisdictional questions.

## A

CPS Energy, a municipally owned utility that serves the San Antonio area, is a market participant in the ERCOT wholesale market. CPS buys and sells power through ERCOT, so ERCOT both collects money from CPS and pays money to CPS. The parties settle the amounts owed by each side and pay each other accordingly in what they call

---

[12] *Id.*; *see* Fleisher, *supra* note 10, at 11.

[13] Act of May 27, 1999, 76th Leg., R.S., ch. 405 § 39, 1999 Tex. Gen. Laws 2543, 2558 (codified at TEX. UTIL. CODE ch. 39).

[14] TEX. UTIL. CODE § 39.051; *see id.* § 39.001(a), (b); *Oncor Elec. Delivery Co.*, 507 S.W.3d at 708-709.

[15] TEX. UTIL. CODE § 39.151(a).

[16] *Id.* § 39.151; 16 TEX. ADMIN. CODE § 25.361. On May 28, 2023, the Legislature amended Section 39.151. The amendments are effective September 1, 2023, and they do not affect the proceeding analysis or our holding. *See* Act of May 28, 2023, 88th Leg., R.S., ch. 410, § 15, 2023 Tex. Sess. Law Serv. ___ (H.B. 1500).

"settlement" payments. At issue here are payments from ERCOT to CPS. CPS' participation in the market is governed by the terms of a Standard Form Market Participant Agreement, PURA, and the ERCOT Protocols, which are rules promulgated by ERCOT to manage the market and the grid.

In February 2021, Texans endured the catastrophic Winter Storm Uri. On February 15, just as the storm hit, ERCOT declared its highest state of emergency, Emergency Energy Alert Level 3, and directed transmission operators to curtail firm load. The PUC then directed ERCOT to set the per-megawatt-hour price of electricity at the highest permissible rate of $9,000 to reflect scarcity of supply. ERCOT recalled its firm load shed instructions on February 17 but kept prices at the cap rate for an additional 32 hours through the morning of February 19. CPS alleges that ERCOT should have ended its pricing intervention when it recalled its firm load shed instructions and that its failure to do so resulted in $16 billion in overcharges to market participants.

Some market participants defaulted after the storm. Pursuant to its Protocols, ERCOT then implemented its "short-pay" procedure and its "Default Uplift process".[17] These processes spread the impact of the default, allocating the loss among market participants—including CPS—by reducing the amounts they are owed by ERCOT.[18] CPS alleges that it was short-paid at least $18 million through the short-pay process. It also alleges that ERCOT intended to apply two downward

---

[17] *See* ERCOT NODAL PROTOCOLS §§ 9.19(1)(d)-(e), 9.19.1.

[18] *See id.* §§ 9.19(1)(d)-(e), 9.19.1.

6

adjustments to the credit in CPS' account by over $1 million each through the default-uplift process.[19]

CPS sued ERCOT and several of its officers for breach of contract, negligence, breach of fiduciary duty, and violations of the Texas Constitution.[20] ERCOT filed a plea to the jurisdiction, arguing that CPS' claims are barred by sovereign immunity and, alternatively, that the PUC has exclusive jurisdiction over the claim. The trial court denied the plea.[21]

ERCOT appealed, asserting that it is a governmental unit entitled to an interlocutory appeal from the denial of a plea to the jurisdiction.[22] ERCOT also sought review by petition for writ of mandamus in the event it is not entitled to an interlocutory appeal. After one court of appeals panel summarily denied mandamus relief,[23] ERCOT filed its petition for writ of mandamus in this Court[24] to

---

[19] CPS secured a temporary restraining order from the trial court that prevented ERCOT from applying these downward adjustments. The court of appeals dissolved its order extending the temporary restraining order when it dismissed CPS' claims. 648 S.W.3d at 541.

[20] CPS also alleged that ERCOT's executives and board acted ultra vires and it sought prospective injunctive relief against downward adjustments for the storm-related default through the default-uplift process. CPS later nonsuited all individual defendants except Bill Magness, ERCOT's former CEO. The court of appeals determined that Magness was not a party to the plea to the jurisdiction that is the subject of this appeal. *Id.* at 532-533.

[21] The trial court also denied ERCOT's motion to transfer venue to Travis County.

[22] *See* TEX. CIV. PRAC. & REM. CODE § 51.014(a)(8).

[23] 2021 WL 2814899 (Tex. App.—San Antonio July 7, 2021) (mem. op.).

[24] *In re Elec. Reliability Council of Tex., Inc.*, No. 21-0834.

continue the alternative path to review. A different court of appeals panel then held that ERCOT is a governmental unit entitled to take an interlocutory appeal, that the PUC has exclusive jurisdiction over CPS' claims, and that CPS' claims should be dismissed.[25] We granted review and set the case for oral argument on the same day as the case brought by the Panda Power Companies.[26]

**B**

As part of ERCOT's functions, the PUC requires ERCOT to annually publish resource adequacy reports that project, for at least the next five years, the capability of existing electric generation resources to meet projected demand in the Texas power region.[27] ERCOT does so by publishing "Capacity, Demand, and Reserves" reports (CDRs). ERCOT's 2011 and 2012 CDRs projected a likelihood of severe energy shortfalls. Panda, a group of private-equity investors, alleges that it relied on these reports when it decided to invest billions of dollars to build three new power plants. After construction on the new plants began, ERCOT revised its CDRs and forecast a future oversupply of generation capacity. Panda sued ERCOT for fraud, negligent misrepresentation, and breach of fiduciary duty. Panda alleges that ERCOT's misleading reports caused it substantial financial harm and seeks damages in excess of $2 billion.

The procedural history of this case is long and complex, and we recite only what is relevant to the disposition of this appeal. ERCOT

---

[25] 648 S.W.3d at 531, 541.

[26] ERCOT's petition for writ of mandamus is dismissed as moot.

[27] TEX. UTIL. CODE § 39.155(b); 16 TEX. ADMIN. CODE § 25.505(b).

filed two pleas to the jurisdiction arguing that the PUC has exclusive jurisdiction over Panda's claims and that ERCOT has sovereign immunity. The trial court denied both. ERCOT appealed, arguing that it is a "governmental unit" under the Texas Tort Claims Act entitled to an interlocutory appeal from the denial of its plea to the jurisdiction.[28] ERCOT alternatively sought review by mandamus. The court of appeals consolidated the appeal and mandamus petition and held that ERCOT is not a governmental unit entitled to an interlocutory appeal but that ERCOT has sovereign immunity.[29] Accordingly, the court of appeals dismissed ERCOT's interlocutory appeal for lack of jurisdiction, conditionally granted its petition for writ of mandamus, and directed the trial court to dismiss the case for lack of jurisdiction.[30] The trial court immediately complied, and Panda appealed. The court of appeals, then sitting en banc, changed course. Relying on three immunity cases decided by this Court in the interim, and with one justice dissenting, the court held that ERCOT is not entitled to sovereign immunity and that the PUC does not have exclusive jurisdiction over Panda's claims.[31] We granted ERCOT's petition for review.

---

[28] TEX. CIV. PRAC. & REM. CODE § 51.014(a)(8); *id.* § 101.001(3).

[29] *Elec. Reliability Council of Tex., Inc. v. Panda Power Generation Infrastructure Fund, LLC*, 552 S.W.3d 297, 301 (Tex. App.—Dallas 2018), *pet. dism'd as moot*, 619 S.W.3d 628, 631 (Tex. 2021).

[30] *Id.* Additional procedural history thereafter is available in this Court's prior opinion. *Elec. Reliability Council of Tex., Inc. v. Panda Power Generation Infrastructure Fund, LLC*, 619 S.W.3d 628, 632-634 (Tex. 2021).

[31] 641 S.W.3d at 899.

## II

The first issue arises from CPS' petition: whether ERCOT is a governmental unit under the Texas Tort Claims Act and thus entitled to take an interlocutory appeal from the denial of a plea to the jurisdiction.[32] "Although private institutions are not commonly understood to be a part 'of government,' we have held that a private institution can be a governmental unit", as is the case here.[33]

"[T]he general rule, with a few mostly statutory exceptions, is that an appeal may be taken only from a final judgment."[34] However, certain statutes authorize interlocutory appeals over particular kinds of trial court orders.[35] Section 51.014(a)(8) of the Civil Practice and Remedies Code authorizes an interlocutory appeal from a trial-court order that "grants or denies a plea to the jurisdiction by a governmental unit as that term is defined" in the Tort Claims Act.[36] In turn, the Tort Claims Act defines "[g]overnmental unit" to include not only the state and its agencies and political subdivisions, but also "any other institution, agency, or organ of government the status and authority of which are derived from the Constitution of Texas or from laws passed by the

---

[32] *See* TEX. CIV. PRAC. & REM. CODE § 51.014(a)(8); *id.* § 101.001(3).

[33] *Univ. of the Incarnate Word v. Redus* (*Redus I*), 518 S.W.3d 905, 907 (Tex. 2017).

[34] *Bonsmara Nat. Beef Co. v. Hart of Tex. Cattle Feeders, LLC*, 603 S.W.3d 385, 387 (Tex. 2020) (quoting *Lehmann v. Har-Con Corp.*, 39 S.W.3d 191, 195 (Tex. 2001)).

[35] *See id.* at 390 & n.3.

[36] TEX. CIV. PRAC. & REM. CODE § 51.014(a)(8); *see id.* § 101.001(3).

10

legislature under the constitution."[37] Thus, a private, non-governmental entity can qualify as a governmental unit under this definition, but only if (1) it is an institution, agency, or organ of government; and (2) it derives its status and authority as such from the Texas Constitution or statutes.[38]

## A

In *LTTS Charter School, Inc. v. C2 Construction, Inc.*, we held that an open-enrollment charter school qualified as a governmental unit because it was "indisputably part of the Texas public-education system" and derived that status and authority from state statutes.[39] Our holding centered on various statutory pronouncements. We concluded that open-enrollment charter schools derive their status from the Education Code, which provides that they are "part of" the state's public-school system.[40] Their authority is also derived from the Education Code, which assigns them responsibilities for implementing the public-education system, provides them with substantial public funding and resources, grants them the same powers and privileges of traditional public schools, and subjects them to the same rules that govern public schools.[41] Finally, the Education Code designates open-enrollment charter schools as "governmental entit[ies]", "political subdivision[s]", and "local

---

[37] *Id.* § 101.001(3).

[38] *Id.*; *Redus I*, 518 S.W.3d at 907.

[39] 342 S.W.3d 73, 76 (Tex. 2011).

[40] *Id.* at 77.

[41] *Id.* at 77-78.

government[s]" for various purposes.[42]

In *University of the Incarnate Word v. Redus* (*Redus I*), we concluded that a private university that operates a state-authorized police department qualifies as a governmental unit when defending suits relating to the department's actions.[43] We acknowledged that, unlike the charter schools at issue in *LTTS*, private universities do not receive public funding and are not statutorily labeled as governmental entities for any particular purpose.[44] Nevertheless, we observed that state statutes grant private universities the "status and authority" to operate a police department using commissioned peace officers and subject them to state law-enforcement rules and requirements, just like a municipal police department.[45] And although no statute expressly designates a private university or its police department as "part of" the state's law-enforcement system, we concluded that the university was an "organ of government" for purposes of its police department because it "operates as part of a larger governmental system" and performs the "uniquely governmental" function of law enforcement.[46]

## B

CPS maintains that unlike in *LTTS* and *Redus I*, there are no strong legislative indicators of governmental-unit status in relation to ERCOT and that in concluding otherwise, the court of appeals applied

---

[42] *Id.* at 78 (quoting TEX. EDUC. CODE § 12.1053).

[43] 518 S.W.3d at 906.

[44] *Id.* at 910.

[45] *Id.* at 909; *see id.* at 910-911.

[46] *Id.* at 909, 910, 911.

an impermissibly broad view of "organ of government". It argues further that ERCOT does not perform a "uniquely governmental function" and that ERCOT's actions during the winter storm event were merely operational. For its part, ERCOT contends that it is an organ of government because it is an essential part of a larger governmental system, namely the PUC's regulation of electric utilities, as evidenced by its delegated rulemaking authority and various provisions of PURA.

**1**

As we recognized in *Redus I*, an "organ of government" is an entity that "operates as part of a larger governmental system" and performs a "uniquely governmental" function.[47] Here, ERCOT operates as part of the state's broader electricity-regulation system under PURA and performs the uniquely governmental function of utilities regulation.

PURA was enacted "to establish a comprehensive and adequate regulatory system for public utilities", including electric utilities and telecommunications utilities.[48] Under PURA, the PUC—a governmental entity—was given the "general power" to regulate and supervise public utilities.[49] Within this larger governmental system of utilities regulation is the express requirement of an independent system operator for the Texas power region.[50] This ISO is tasked with ensuring that (1) all electricity buyers and sellers have nondiscriminatory access to the region's transmission and distribution system, (2) the region's electrical

---

[47] *Id.* at 910, 911.

[48] TEX. UTIL. CODE § 11.002(a).

[49] *Id.* § 14.001; *see also id.* § 11.002(c).

[50] *Id.* § 39.151(a).

network is reliable and adequate, (3) information regarding a customer's choice of retail electric provider is timely available to those who need it, and (4) electricity production and delivery are accurately accounted for.[51]

ERCOT performs these functions under the direct oversight of the PUC and must do so in compliance with the requirements set forth in PURA.[52] In *LTTS*, we observed that the open-enrollment charter school was required to meet "financial, governing, and operational standards" under the Education Code and that the Commissioner of Education was empowered to audit the school and revoke its charter for failure to comply with the Code.[53] ERCOT is subject to similar requirements and more under PURA and by the PUC.

The PUC certifies the ISO, and, as the ISO, ERCOT is "directly responsible and accountable" to the PUC.[54] The PUC has extensive authority over ERCOT, including "complete authority" over ERCOT's "finances, budget, and operations"—including the ability to audit its financials—to ensure that ERCOT adequately performs its functions and duties.[55] The PUC has authority over ERCOT's bylaws and protocols, and the chairman of the PUC sits on ERCOT's board.[56] The PUC can penalize and even decertify ERCOT if it fails to adequately

---

[51] *Id.*

[52] *See id.* § 39.151(d).

[53] 342 S.W.3d at 80.

[54] TEX. UTIL. CODE § 39.151(d).

[55] *Id.* § 39.151(d), (d-4)(3); *see also id.* § 39.151(e).

[56] *Id.* § 39.151(g-1).

perform its functions and duties or if it fails to comply with PURA.[57]

Additionally, the regulation of utilities is "uniquely governmental".[58] As the certified ISO, ERCOT exercises delegated authority from the PUC to "adopt and enforce rules relating to the reliability of the regional electrical network".[59] It is also tasked with "enforc[ing] operating standards" and establishing and overseeing payment procedures for transactions by market participants within the electrical network.[60] Market participants are statutorily required to abide by all rules and procedures established by the ISO, and their failure to do so could result in a penalty.[61]

Because ERCOT performs a "uniquely governmental" function as part of a "larger governmental system", it is an organ of government.[62]

## 2

ERCOT also derives its "status and authority" from statute.[63] Its status derives from statute because PURA requires the PUC to "establish one or more independent organizations"—that is, an

---

[57] *Id.* § 39.151(d), (d-4)(5).

[58] *Redus I*, 518 S.W.3d at 911; *see Ark. Elec. Coop. Corp. v. Ark. Pub. Serv. Comm'n*, 461 U.S. 375, 377 (1983) ("[T]he regulation of utilities is one of the most important of the functions traditionally associated with the police power of the States.").

[59] TEX. UTIL. CODE § 39.151(d).

[60] *Id.* § 39.151(i).

[61] *Id.* § 39.151(j).

[62] *Redus I*, 518 S.W.3d at 910, 911.

[63] TEX. CIV. PRAC. & REM. CODE § 101.001(3); *Redus I*, 518 S.W.3d at 907.

organization that is "sufficiently independent" of any electricity producer or seller—to serve as the region's ISO.[64] An independent organization can serve as the region's ISO only if the PUC certifies it for that purpose.[65] Its authority also comes from statute because PURA grants a certified ISO authority to supervise the Texas power region's transmission facilities and to coordinate its market transactions, transmissions planning, and network reliability.[66] Thus, although ERCOT is a private, nonprofit corporation, its "status" as the ISO for the Texas power region and its "authority" to act in that capacity derive directly from PURA.

Because ERCOT is an "organ of government the status and authority of which are derived from" statute, it is a "governmental unit" entitled to take an interlocutory appeal from the denial of a plea to the jurisdiction.[67]

### III

The next issue, presented in both cases, is whether the PUC has exclusive jurisdiction over issues underlying the parties' claims against ERCOT. We conclude that it does.

Courts are presumed to have jurisdiction to resolve legal disputes.[68] "To overcome that presumption, the Constitution or another

---

[64] TEX. UTIL. CODE § 39.151(a), (b).

[65] *Id.* § 39.151(c).

[66] *Id.* § 31.002(9); *see also id.* § 39.151.

[67] TEX. CIV. PRAC. & REM. CODE § 101.001(3); *id.* § 51.014(a)(8).

[68] *Oncor Elec. Delivery Co. v. Chaparral Energy, LLC,* 546 S.W.3d 133, 138 (Tex. 2018) (citing *In re Entergy Corp.,* 142 S.W.3d 316, 322 (Tex. 2004));

law must grant exclusive jurisdiction to another court or an administrative agency."[69] A statute may grant an agency exclusive jurisdiction either expressly or by establishing a "pervasive regulatory scheme" that impliedly "indicates that the Legislature intended for the regulatory process to be the exclusive means of remedying the problem to which the regulation is addressed."[70] Thus, to establish exclusive jurisdiction over a particular issue, there must be (1) an express or implied grant of exclusive jurisdiction and (2) the issue must "fall[] within that jurisdictional scope."[71] If the agency's exclusive jurisdiction is established, the claimant must pursue and exhaust all available administrative remedies before turning to the courts.[72] "Until then, the trial court lacks subject-matter jurisdiction" and must dismiss the claims with issues that come within the agency's exclusive jurisdiction.[73]

## A

ERCOT does not claim that the PUC has been expressly granted exclusive jurisdiction over the issues underlying CPS' and Panda's claims; rather, it argues that Section 39.151 of the Utilities Code

---

*see also* TEX. CONST. art. V, § 8.

[69] *Chaparral Energy*, 546 S.W.3d at 138 (citing *In re Sw. Bell Tel. Co.*, 235 S.W.3d 619, 624-625 (Tex. 2007)).

[70] *Id.* (quoting *In re Sw. Bell Tel. Co.*, 235 S.W.3d at 624-625).

[71] *Id.* at 139; *see id.* at 138.

[72] *Forest Oil Corp. v. El Rucio Land & Cattle Co.*, 518 S.W.3d 422, 428 (Tex. 2017).

[73] *Id.* (citing *Subaru of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 221 (Tex. 2002)).

constitutes a pervasive regulatory scheme that imparts exclusive jurisdiction. We agree.

Section 39.151 grants the PUC extensive and ultimate authority over an ISO. As mentioned, the statute provides that the ISO "is directly responsible and accountable to the [PUC]," and the PUC "has *complete* authority to oversee and investigate [ERCOT]'s finances, budget, and operations" to ensure adequate performance of the ISO's "functions and duties."[74] It grants the PUC authority over ERCOT's board makeup, its bylaws and protocols, and its ability to charge fees to its members.[75] ERCOT is empowered to enact rules over market participants, but they must be approved by the PUC.[76] Moreover, the PUC's authority over ERCOT is not solely regulatory; it has adjudicatory power as well. The PUC may "take appropriate action" against the ISO, including decertification, for the ISO's failure to adequately perform its functions or duties or for its failure to comply with Section 39.151.[77] Section 39.151's grant of extensive authority to the PUC over ERCOT and its detailed regulation of the particulars of ERCOT's functions constitute a pervasive regulatory scheme.[78]

---

[74] TEX. UTIL. CODE § 39.151(d) (emphasis added).

[75] *Id.* § 39.151(d), (e), (g-1).

[76] *Id.* § 39.151(d); *see also id.* § 39.151(j).

[77] *Id.* § 39.151(d).

[78] *Cf. In re Entergy Corp.*, 142 S.W.3d at 323 ("The Legislature's description of PURA as 'comprehensive,' coupled with the fact that PURA regulates even the particulars of a utility's operations and accounting, demonstrates the statute's pervasiveness.").

**B**

The next inquiry is whether issues underlying the parties' claims fall within the regulatory scheme's jurisdictional scope.[79] The question is whether "the Legislature intended . . . the regulatory process to be the exclusive means of remedying the problem to which the regulation is addressed."[80] As to both Panda and CPS, we conclude that the issues underlying their claims come within the scope of the PUC's exclusive jurisdiction.

**1**

We begin with Panda's issues. PURA requires that ERCOT publish CDRs that "identify[] existing and potential transmission and distribution constraints and system needs" within the Texas power region, including alternatives and recommendations for meeting those needs.[81] Panda contends that ERCOT failed to properly perform this requirement by issuing fraudulent CDRs that inaccurately reported the capability of existing electric generation resources to meet projected demand in the Texas power region. Because the proper performance of ERCOT's operations, functions, and duties comes within the PUC's "complete" authority over ERCOT, and because the PUC is statutorily authorized to hold ERCOT accountable if, as Panda alleges, ERCOT fails to properly perform, we hold that Panda's issues come within the

---

[79] *See Chaparral Energy*, 546 S.W.3d at 139.

[80] *Id.* at 138 (quoting *In re Sw. Bell Tel. Co.*, 235 S.W.3d at 624-625).

[81] TEX. UTIL. CODE § 39.155(b); *see also* 16 TEX. ADMIN. CODE § 25.505(c).

19

PUC's exclusive jurisdiction.[82]

Panda notes that the PUC "has no authority to determine whether ERCOT complied with the relevant common-law standards or to provide a remedy." While that is true, an agency's exclusive jurisdiction does not prevent an aggrieved party from pursuing damages or other relief in the trial court after the agency has exercised its exclusive jurisdiction over the relevant issues.[83]

**2**

Likewise, CPS' issues come within the jurisdictional scope of the PUC's exclusive jurisdiction. CPS alleges that, *inter alia*, ERCOT "failed to implement its protocols in a way to ensure the integrity of its system", "failed to take reasonable precautions to meet its load projections expected as a result of" Winter Storm Uri, "failed to take reasonable corrective action when it became clear that its own projections showed insufficient capacity to meet forecast demand", and failed to correct "an acknowledged $16 billion error". Additionally, CPS essentially seeks exemption from ERCOT's short-pay and default-uplift procedures for charges relating to the Winter Storm default because it claims that they are due to ERCOT's own error and its subsequent failure to retroactively reprice the alleged overcharge.

These issues involve "the very activit[ies] the [PUC] regulates."[84] CPS' issues implicate ERCOT's operations and billing, which fall under

---

[82] TEX. UTIL. CODE § 39.151(d).

[83] *See Chaparral Energy*, 546 S.W.3d at 141-142.

[84] *In re Oncor Elec. Delivery Co.*, 630 S.W.3d 40, 49 (Tex. 2021).

20

the PUC's "complete authority".[85] And while ERCOT oversees transaction settlement payment procedures, it does so by delegated authority from the PUC.[86] Additionally, CPS specifically alleged that ERCOT's actions (and inactions) violated Section 39.151 of the Utilities Code because it failed to perform its functions of "ensur[ing] access to the transmission and distribution systems for all buyers and sellers of electricity" and "ensur[ing] the reliability and adequacy of the regional electrical network".[87] By statute, the PUC is responsible for ensuring that ERCOT "adequately performs [its] functions and duties", and the PUC may take action against ERCOT should it fail to do so.[88] Thus, CPS' issues fall within the PUC's exclusive jurisdiction.

CPS raises a host of arguments to support its claim that the PUC does not have exclusive jurisdiction or that it is not required to exhaust administrative remedies. All fall short. CPS contends that the PUC does not have exclusive jurisdiction because it cannot adjudicate a contract claim or award damages. However, CPS' claim for breach of the Standard Form Market Participant Agreement involves whether ERCOT properly implemented its protocols, which comes within the PUC's exclusive jurisdiction.[89] As to damages, as mentioned, an agency's

---

[85] TEX. UTIL. CODE § 39.151(d).

[86] *Id.* § 39.151(i).

[87] *Id.* § 39.151(a)(1), (2).

[88] *Id.* § 39.151(d).

[89] *See id.* § 39.151(d) ("Rules adopted by an independent organization . . . under delegated authority from the [PUC] are subject to [PUC] oversight . . . ."); *cf. Chaparral Energy*, 546 S.W.3d at 139-140 (holding

exclusive jurisdiction does not prevent a party from pursuing damages or other relief in the trial court after it has exhausted administrative remedies.[90] Moreover, CPS primarily argues that its damages stem from ERCOT's alleged overcharge during the storm and its failure to retroactively reprice that overcharge. The PUC has authority to oversee transaction settlement procedures and authority over ERCOT's finances; therefore, presumably, it could order ERCOT to resettle its payments to CPS.[91]

CPS argues that it was not required to exhaust administrative remedies because it needed immediate injunctive relief.[92] But PUC rules permit the PUC to order ERCOT to suspend complained-of conduct while a complaint is pending.[93] CPS also argues that exhaustion of administrative remedies is inapplicable where the action concerns questions of law. But CPS' issues raise various fact questions including how much supply was available for the 32 hours after ERCOT recalled its firm load shed instructions, which is necessary to determine what the appropriate per-megawatt-hour price was. Thus, this exception to the

---

that PUC had exclusive jurisdiction because the issue involved a public utility's services, even though customer asserted a breach-of-contract claim for money damages).

[90] *Chaparral Energy*, 546 S.W.3d at 141-142.

[91] *See* TEX. UTIL. CODE § 39.151(d), (i).

[92] *See Hous. Fed'n of Tchrs., Loc. 2415 v. Hous. Indep. Sch. Dist.*, 730 S.W.2d 644, 646 (Tex. 1987).

[93] *See* 16 TEX. ADMIN. CODE § 22.251(i).

exhaustion requirement does not apply.[94]

Finally, CPS contends that exhaustion is not required because it asserts constitutional claims. Specifically, CPS argues that the loss allocation under the short-pay and default-uplift procedures amounts to an unconstitutional taking in violation of Article I, Section 17 of the Texas Constitution and an unconstitutional extension of credit in violation of Article XI, Section 3. However, "a litigant must avail itself of statutory remedies that may moot its takings claim, rather than directly institute a separate proceeding asserting such a claim."[95] Here, a decision from the PUC on the underlying issues could moot CPS' constitutional claims. Were the PUC to order adjustment of the alleged overcharge pricing or resettlement of ERCOT's payments to CPS, it would cure the alleged violations and obviate the need to assert the constitutional claims in court.[96] And even if it does not, a party is not precluded from pursuing its constitutional claims after exhaustion or from seeking judicial review of any PUC rulings on issues underlying those claims.[97]

In sum, the PUC has exclusive jurisdiction over CPS' claims. As a result of our holding, we need not address ERCOT's alternative argument regarding exclusive jurisdiction in Travis County district

---

[94] *Clint Indep. Sch. Dist. v. Marquez*, 487 S.W.3d 538, 557-558 & n.13 (Tex. 2016).

[95] *Garcia v. City of Willis*, 593 S.W.3d 201, 211 (Tex. 2019) (citing *City of Dallas v. Stewart*, 361 S.W.3d 562, 579 (Tex. 2012)).

[96] *See id.* at 211-212.

[97] *Chaparral Energy*, 546 S.W.3d at 141-142.

court or the Third Court of Appeals, nor its argument that the PUC is an indispensable party.

## IV

ERCOT's primary argument is that it is entitled to sovereign immunity. We agree.

"Sovereign immunity provides that 'no state can be sued in her own courts without her consent, and then only in the manner indicated by that consent.'"[98] It is "'inherent' in Texas statehood and 'developed without any legislative or constitutional enactment.'"[99] In determining whether a legislatively authorized entity is entitled to share in the state's immunity, we look to whether "the governing statutory authority demonstrates legislative intent to grant an entity the 'nature, purposes, and powers' of an 'arm of the State government'".[100] We also look to whether extending immunity would "satisfy the political, pecuniary, and pragmatic policies underlying our immunity doctrines."[101] If these requirements are met, the "'entity is a government unit unto itself' and is 'entitled to assert immunity in its own right' when it performs a

---

[98] *Univ. of the Incarnate Word v. Redus* (*Redus II*), 602 S.W.3d 398, 403 (Tex. 2020) (quoting *Hosner v. DeYoung*, 1 Tex. 764, 769 (1847)).

[99] *Id.* at 403-404 (quoting *Wasson Ints., Ltd. v. City of Jacksonville*, 489 S.W.3d 427, 429, 431 (Tex. 2016)).

[100] *El Paso Educ. Initiative, Inc. v. Amex Props., LLC*, 602 S.W.3d 521, 527 (Tex. 2020) (quoting *Ben Bolt-Palito Blanco Consol. Indep. Sch. Dist. v. Tex. Pol. Subdivs. Prop./Cas. Joint Self-Ins. Fund*, 212 S.W.3d 320, 325 (Tex. 2006)).

[101] *Rosenberg Dev. Corp. v. Imperial Performing Arts, Inc.*, 571 S.W.3d 738, 750 (Tex. 2019).

24

'governmental function.'"[102]

## A

Three of our recent cases explored the boundaries and contours of sovereign and governmental immunity and are pertinent to our analysis here. In *Rosenberg Development Corp. v. Imperial Performing Arts, Inc.*, we addressed for the first time whether a private entity could possess the "nature, purposes, and powers of an arm of the State government" and thus qualify as an entity protected by sovereign or governmental immunity.[103] *Rosenberg* involved an economic development corporation created by a municipality, as authorized by the Texas Development Corporation Act.[104] The economic development corporation was a private, nonprofit entity, but it was incorporated exclusively for a public purpose: to promote enterprises to spur economic growth in the city.[105] Under the statute, it was authorized to fund projects with tax dollars or the proceeds of revenue bonds.[106] It was also subject to compliance with the Texas Open Meetings Act and the Texas Public Information Act.[107] The municipality had some supervisory control over the corporation, but ultimately, "all the powers of the corporation [were] vested in the

---

[102] *Redus II*, 602 S.W.3d at 405 (quoting *Ben Bolt*, 212 S.W.3d at 325-326).

[103] 571 S.W.3d at 749 (internal quotation marks omitted).

[104] *Id.* at 741.

[105] *Id.* at 741, 745.

[106] *Id.* at 744.

[107] *Id.* at 745.

corporation's board of directors."[108] Importantly, the Development Corporation Act provided that an economic development corporation "is not a political subdivision or a political corporation for purposes of the laws of this state", and it barred municipalities from delegating to the corporation any "attributes of sovereignty."[109] Ultimately, we concluded that the Development Corporation Act "evinces clear legislative intent that an economic development corporation is not an arm of state government."[110] We also held that granting immunity did not "satisfy the political, pecuniary, and pragmatic policies underlying our immunity doctrines" because "[g]overnmental immunity benefits the public by preventing disruptions of key governmental services," but economic development corporations do not perform essential services.[111]

Next, in *University of the Incarnate Word v. Redus* (*Redus II*), we considered whether sovereign immunity applied to the private university involved in *Redus I*, which was sued for the actions of its statutorily authorized police department.[112] We concluded that it was not immune because the university did not possess the nature, purposes, and powers of an arm of the state government, nor did applying sovereign immunity support the doctrine's nature and purposes.[113] Central to our holding was the lack of control the state exercised over

---

[108] *Id.* (internal alterations and quotation marks omitted).

[109] *Id.*

[110] *Id.* at 750.

[111] *Id.*

[112] *See Redus II*, 602 S.W.3d at 401-402.

[113] *See id.*

the university and its police department. We noted that "[t]he State did not charter" the university, nor did it set the police "department's policies, procedures, or protocols."[114] We further observed that the state did not "hire or fire the [u]niversity's officers" and that "[t]he [u]niversity's administration, and its private governing board, are alone responsible for its police department's day-to-day operations and decision making."[115] Ultimately, because the university's police department was "not accountable to the government," we concluded that it was not an arm of the state.[116] We also held that extending sovereign immunity to the university did not further the doctrine's purposes of protecting the public treasury and preserving the separation of government power.[117] We observed that the university, not the state, funded the police department, and therefore no tax dollars were at stake.[118] This foreclosed any risk of invading the separation of powers because there could be no judicial reallocation of public funds.[119] Additionally, there were no concerns regarding the diversion of public funds from government functions in order to pay judgments.[120]

On the same day we decided *Redus II*, we also decided *El Paso Education Initiative v. Amex Properties*, issuing the first and only

---

[114] *Id.* at 407; *see id.* at 407-408.

[115] *Id.* at 407.

[116] *Id.* at 408.

[117] *Id.* at 409.

[118] *Id.*

[119] *Id.*

[120] *Id.* at 409-410.

27

opinion in which we have extended sovereign or governmental immunity to a private entity under the arm-of-the-state analysis.[121] We observed that the Education Code expressly stated the Legislature's intent that open-enrollment charter schools be "immune from liability and suit to the same extent as a [public] school district".[122] We concluded that, although charter schools are typically private, non-profit organizations, they have the nature, purposes, and powers of an arm of the state because they are regulated by and accountable to the state's Commissioner of Education, are largely publicly funded, educate nearly six percent of the state's students, "exercise the same powers and perform government tasks in the same manner as traditional public schools[,] . . . expressly operate as part of the State's public education system, and . . . are generally open to the public."[123] We also concluded that extending governmental immunity to open-enrollment charter schools would serve the doctrine's nature and purposes by protecting public funds from lawsuits and judgments that would reallocate the funds from the Legislature's designated purpose.[124] It would also protect the separation of governmental powers by respecting the Legislature's policy choices on how to provide and fund a free, public education, as well as its express desire that charter schools have the same governmental immunity from suit and liability as public schools.[125]

---

[121] 602 S.W.3d at 529-530.

[122] *Id.* at 529.

[123] *Id.* at 528-530.

[124] *Id.* at 530.

[125] *Id.*

**B**

ERCOT "do[es] not fall neatly into any camp".[126] It is a unique entity serving a role that is not clearly analogous to a public entity like a police department or a public school. Yet, it provides an essential governmental service. While the Legislature has not expressly stated a desire that ERCOT be immune from suit, as it did in *Amex Properties*, the "the governing statutory authority"—PURA—nevertheless "demonstrates legislative intent to grant [ERCOT] the 'nature, purposes, and powers' of an 'arm of the State government'".[127] ERCOT operates under the direct control and oversight of the PUC, it performs the governmental function of utilities regulation, and it possesses the power to adopt and enforce rules pursuant to that role. In addition, recognizing immunity satisfies the "political, pecuniary, and pragmatic policies" underlying immunity because it prevents the disruption of key governmental services, protects public funds, and respects separation of powers principles.[128] Thus, ERCOT is immune from suit.

ERCOT's governmental nature is demonstrated most prominently by the level of control and authority the state exercises over it and its accountability to the state. In this regard, it is much like a state agency, and it stands in stark contrast to the private university in *Redus II*. The PUC certified ERCOT as the ISO, and, as set forth in Section 39.151 of the Utilities Code, it has "complete authority" over

---

[126] *Redus II*, 602 S.W.3d at 406.

[127] *Amex Props.*, 602 S.W.3d at 527 (quoting *Ben Bolt*, 212 S.W.3d at 325).

[128] *Rosenberg*, 571 S.W.3d at 750.

ERCOT's operations.[129] In other words, the state has complete authority over everything ERCOT does to perform its statutory functions. The statute also grants the PUC authority over ERCOT's governance. ERCOT's bylaws and protocols are subject to PUC approval, and they "must reflect the input of the [PUC]."[130] While ERCOT has a board of directors, the state controls that too. Specifically, under Section 39.151, ERCOT's "governing body must be composed of [eight] persons selected by the ERCOT board selection committee."[131] In turn, the board selection committee comprises members appointed by the three highest ranking officials in state government: the Governor, the Lieutenant Governor, and the Speaker of the House of Representatives.[132] In addition to the members selected by the committee, the board also includes two state officials, the Chairman of the PUC and the Counsellor of the Public Utility Counsel.[133] The final member of the board is ERCOT's CEO, whose selection is subject to PUC review and approval.[134]

Section 39.151 also grants the PUC "complete authority" over

---

[129] TEX. UTIL. CODE § 39.151(d).

[130] *Id.* § 39.151(g-1).

[131] *Id.* § 39.151(g), (g-1).

[132] *Id.* § 39.1513.

[133] *Id.* § 39.151(g-1). Under the recent amendments to Section 39.151, the PUC must have two commissioners on the ISO's board, the presiding officer of the PUC and one other commissioner who will serve a one-year term. *See* Act of May 28, 2023, *supra* note 16.

[134] TEX. UTIL. CODE § 39.151(g-1); 16 TEX. ADMIN. CODE § 25.362(h).

ERCOT's finances and budget.[135] ERCOT must submit its proposed annual budget to the PUC, which can "approve, disapprove, or modify any item" in it.[136] ERCOT is authorized to charge a system administration fee, but only after the PUC approves its budget and sets the fee range.[137] ERCOT must provide the PUC with reports that compare its actual expenditures with its budgeted expenditures, and the PUC is authorized to audit ERCOT's finances.[138]

In addition to the control the PUC exercises over ERCOT, Section 39.151(d) holds that ERCOT is "directly responsible and accountable to the [PUC]".[139] In *Amex Properties*, the open-enrollment charter school was entitled to governmental immunity in part because it "must adhere to state law and the [Commissioner of Education]'s regulations . . . or risk revocation of its charter."[140] Here, the PUC is empowered to "take appropriate action against" ERCOT if it fails to adequately perform or adhere to the requirements set forth in Section 39.151, "including decertifying the organization or assessing an administrative penalty against the organization."[141] And should the PUC decide to decertify ERCOT, the statute requires that ERCOT "transfer[] [its] assets to the successor organization to ensure continuity

---

[135] TEX. UTIL. CODE § 39.151(d).

[136] *Id.* § 39.151(d-1).

[137] *Id.* § 39.151(e).

[138] *Id.* § 39.151(d-4)(3), (e).

[139] *Id.* § 39.151(d).

[140] 602 S.W.3d at 529.

[141] TEX. UTIL. CODE § 39.151(d).

of operations in the region", demonstrating the state's control and ownership of ERCOT's property.[142]

Finally, ERCOT is subject to requirements typically reserved for state entities. For example, among other things, ERCOT is subject to review (but not abolishment) under the Texas Sunset Act, and it is required to open its board meetings to the public.[143] While these requirements are not dispositive—the economic development corporation in *Rosenberg* was also subject to open meetings[144]—when coupled with the state's control, they further support ERCOT's governmental nature.

The dissent argues that these statutory provisions are insufficient to show that ERCOT has been vested with the nature of an arm of the government.[145] Specifically, it argues that ERCOT would not be immune for discretionary and independent actions, and that a factual showing of actual control by the PUC of the complained-of conduct is necessary to determine whether ERCOT's actions were attributable to the government such that it shares in the state's immunity.[146] The dissent would wait to resolve the immunity question until after the PUC exercised its exclusive jurisdiction.[147] To come to this conclusion, the dissent relies heavily on cases involving derivative immunity for

---

[142] *Id.*

[143] *Id.* §§ 39.151(n), 39.1511.

[144] 571 S.W.3d at 745.

[145] *See post* at 7 (Boyd & Devine, JJ., dissenting).

[146] *Id.* at 25-27, 34-43.

[147] *Id.* at 26.

32

government contractors.[148] However, this reliance is misplaced. ERCOT is not a government contractor; it is an "[e]ssential [o]rganization[]" certified by the PUC pursuant to statute, and its argument for immunity is as an arm of the state, not derivative of the state.[149] In *Redus II*, we noted that a derivative immunity case, *Brown & Gay Engineering, Inc. v. Olivares*,[150] was "instructive" in holding that no control by or accountability to the state precludes arm-of-the-state immunity, but we have never held that a complete lack of discretion is required for immunity in an arm-of-the-state analysis for a legislatively authorized entity.[151] "Sovereign immunity is entity-based."[152] Our immunity inquiry looks to legislative intent, and Section 39.151's numerous provisions outlining the PUC's ultimate authority over ERCOT's operations, budget, governance, and property demonstrate the intent to vest ERCOT with the nature of an arm of the state independently of the PUC's actions on a given day.[153]

Moreover, the PUC had significant control and authority over the

---

[148] *Id.* at 30-43.

[149] TEX. UTIL. CODE § 39.151; *id.* § 39.151(c).

[150] 461 S.W.3d 117, 125 (Tex. 2015).

[151] *Redus II*, 602 S.W.3d at 407; *see Amex Props.*, 602 S.W.3d at 529-530.

[152] *Redus II*, 602 S.W.3d at 407.

[153] *See, e.g.*, *Amex Props.*, 602 S.W.3d at 527 (noting that we look to the "governing statutory authority"). The dissent also takes issue with the fact that PURA does not directly address ERCOT, but instead regulates the ISO. *See post* at 22-25 (Boyd & Devine, JJ., dissenting). But ERCOT *is* the ISO for the Texas power region and is, therefore, subject to PURA while it serves in that role.

very conduct at issue in these cases. In CPS' case, the PUC issued the directive to ERCOT to increase pricing to $9,000 per megawatt-hour that resulted in CPS' alleged overcharge. The short-pay procedure and default-uplift process of which CPS complains are set forth in the ERCOT Protocols, and the Protocols are subject to PUC approval.[154] Finally, ERCOT's ability to conduct transaction settlements is through delegated authority from the PUC.[155] As to Panda, ERCOT is required by the PUC to publish CDRs, and those CDRs allegedly caused Panda's injury.[156] Panda conceded at oral argument that the PUC could have controlled the CDR data output had it wanted to.

PURA also evinces a legislative intent to vest ERCOT with the "purposes" and "powers" of an "arm of the State government."[157] PURA requires the PUC to certify an "[e]ssential [o]rganization[]" to operate a competitive electric market and to ensure "the reliability and adequacy" of the grid.[158] In this role, ERCOT regulates the electric utility market. It is statutorily authorized to establish, adopt, and enforce a variety of policies, rules, guidelines, standards, procedures, protocols, and other requirements to govern the operations of market participants.[159] And

---

[154] TEX. UTIL. CODE § 39.151(d), (g-1).

[155] *Id.* § 39.151(i).

[156] *Id.* § 39.155; 16 TEX. ADMIN. CODE § 25.505.

[157] *Amex Props.*, 602 S.W.3d at 527 (quoting *Ben Bolt*, 212 S.W.3d at 325).

[158] TEX. UTIL. CODE § 39.151; *id.* § 39.151(a).

[159] *Id.* § 39.151(d), (i), (j), (*l*).

market participants are statutorily obligated to abide by these rules.[160] This regulatory role over utilities is uniquely governmental.[161]

The fact that ERCOT is organized as a membership-based nonprofit corporation does not make it any less an arm of the state.[162] An entity's organizational form is not dispositive.[163] While corporations do not typically enjoy sovereign immunity, ERCOT is not a typical corporation. Apart from limited liability, one of the hallmarks of a corporation is management by a board of directors in accordance with corporate bylaws.[164] But here, the state has authority over both ERCOT's board and its bylaws.[165] Under Texas law, corporations have the power to, *inter alia*, own property, dispose of property, spend money, incur liabilities, and conduct their business.[166] However, ERCOT may not exercise any of those corporate powers independently of the state. ERCOT's assets are owned by the state.[167] ERCOT may not raise money, spend money, or obtain debt financing without PUC input and approval.[168] The "business" ERCOT conducts is governmental and for the public benefit, and it is set forth by statute and subject to PUC

---

[160] *Id.* § 39.151(j).

[161] *See Ark. Elec. Coop. Corp.*, 461 U.S. at 377.

[162] *ERCOT Organization Backgrounder*, *supra* note 7.

[163] *See Amex Props.*, 602 S.W.3d at 528-529.

[164] TEX. BUS. ORGS. CODE §§ 22.102, 22.152, 22.201.

[165] *See* TEX. UTIL. CODE § 39.151(g), (g-1); *id.* § 39.1513.

[166] *See* TEX. BUS. ORGS. CODE § 2.101(3), (4), (6), (7), (12), (22).

[167] *See* TEX. UTIL. CODE § 39.151(d).

[168] *See id.* § 39.151(d), (d-1), (d-2).

authority and oversight.[169] In short, the fact that the state is utilizing the corporate form to achieve its objectives for the Texas power region does not change governmental nature of ERCOT's actions.[170]

In sum, "the governing statutory authority demonstrates legislative intent to grant [ERCOT] the 'nature, purposes, and powers' of an 'arm of the State government'".[171]

## C

Recognizing ERCOT's immunity also satisfies the "political, pecuniary, and pragmatic policies underlying our immunity doctrines."[172] "Governmental immunity benefits the public by preventing disruptions of key governmental services," and there are few things more fundamental to the state's ability to function than its

---

[169] *See id.* § 39.151(a), (c), (d); *see also id.* § 39.001(a).

[170] Relying on a recent Fifth Circuit concurring opinion, *see Springboards to Educ., Inc. v. McAllen Indep. Sch. Dist.*, 62 F.4th 174, 187-199 (5th Cir. 2023) (Oldham, J., concurring), the dissent contends that "there is no history or tradition of extending common-law sovereign immunity to private corporations." *Post* at 27 (Boyd & Devine, JJ., dissenting). We need not express any opinion on the correctness of that proposition today. But even assuming that it is correct, it does not address circumstances (like here) in which the state has exercised direct control over the corporation and has harnessed it for state-related objectives. Indeed, the U.S. Supreme Court has long recognized that the government cannot, for example, circumvent the state-action requirement by simply enlisting private entities to do its work. *See, e.g.*, *Skinner v. Ry. Lab. Execs.' Ass'n*, 489 U.S. 602, 614 (1989). While a corporation is presumably *not* "the state", we reiterate that an entity's corporate form cannot in and of itself be dispositive of the immunity question.

[171] *Amex Props.*, 602 S.W.3d at 527 (quoting *Ben Bolt*, 212 S.W.3d at 325).

[172] *Rosenberg*, 571 S.W.3d at 750.

electricity grid.[173]

The protection of public funds and assets justifies recognizing ERCOT's immunity. Even though ERCOT is not funded with tax dollars, any damages payments would nevertheless come from the state and the public. ERCOT is primarily funded by a system administration fee charged to wholesale buyers and sellers of electricity.[174] The fee is required to closely match the revenue necessary for its budget without exceeding it to avoid a surplus of funds.[175] In other words, ERCOT charges only what is necessary for it to function. Were a judgment rendered against it, ERCOT would be forced to raise the system administration fee to pay the judgment—assuming the PUC would authorize that[176]—resulting in higher costs for electricity for consumers.

Moreover, the Legislature appears to consider ERCOT's money and assets to be state assets. The system administration fee is statutorily authorized, subject to PUC approval, and collected pursuant to state power.[177] As mentioned, the PUC has authority over ERCOT's finances, including its ability to raise money and how it spends its money.[178] And were ERCOT to be decertified as the ISO, Section 39.151(d) requires that ERCOT "transfer[] [its] assets to the

---

[173] *Id.*

[174] TEX. UTIL. CODE § 39.151(e).

[175] *Id.*

[176] *See id.* § 39.151(d), (d-1).

[177] *Id.* § 39.151(e), (j).

[178] *See id.* § 39.151(d), (d-1), (e).

successor organization".[179] The state's ability to divest ERCOT of those assets and direct their transfer demonstrates the state's ownership over them. Thus, were the assets subject to judicial seizure, the judgment creditor would be the state—not ERCOT.

Finally, recognizing ERCOT's immunity respects separation of powers principles. The judicial imposition of a damages award against ERCOT would run afoul of the Legislature's determination that the PUC alone has "complete authority" over ERCOT's finances.[180] This directive necessarily prevents the courts from enforcing a monetary judgment against it.

Contrary to the dissent's claim, this does not leave ERCOT unaccountable.[181] It simply holds that the courts are not the proper avenue for redress. ERCOT is accountable to the state. Its shortfalls are being addressed by the Legislature, which is accountable to the people through the political process.[182] For example, in direct response to the default of certain ERCOT market participants following Uri, the Legislature passed a bill authorizing the use of $800 million of the Rainy Day Fund for ERCOT to finance part of the default.[183] This helps ensure

---

[179] *Id.* § 39.151(d).

[180] *Id.*

[181] *See post* at 39-40, 51 (Boyd & Devine, JJ., dissenting).

[182] *See In re Stetson Renewables Holdings, LLC*, 658 S.W.3d 292, 297 (Tex. 2022) (observing various ways in which the Legislature could hold an agency accountable for the failure to carry out a statutory program and reasoning that a judicial remedy could "create[] a serious risk that the courts will intrude into the prerogatives of [the] other branches").

[183] *See* Act of May 30, 2021, 87th Leg., R.S., ch. 908, §§ 1, 5, 2021 Tex.

that short-paid market participants like CPS are repaid faster.[184] After the storm, the Legislature overhauled ERCOT's board of directors, making it more independent from electric-market stakeholders and further increasing governmental oversight.[185] It also passed an omnibus bill that required, among other things, weatherization of generation companies' and electric utilities' assets and gave ERCOT authority to inspect for compliance.[186] And it moved up ERCOT's Sunset date by two years, which ensured a comprehensive review of the organization in the near-term.[187]

We hold that ERCOT is entitled to sovereign immunity because PURA "evinces clear legislative intent"[188] to vest it with the "'nature,

---

Gen. Laws 2218, 2218-2227 (H.B. 4492) (codified at TEX. GOV'T CODE § 404.0241, TEX. UTIL. CODE §§ 39.601-39.609); *see also* SUNSET ADVISORY COMMISSION, STAFF REPORT WITH COMMISSION DECISIONS: PUBLIC UTILITY COMMISSION OF TEXAS, ELECTRIC RELIABILITY COUNCIL OF TEXAS, OFFICE OF PUBLIC UTILITY COUNSEL 106-107 (2023), https://www.ercot.com/files/docs/2023/01/20/PUC-ERCOT-OPUC-Staff-Report-with-Commission-Decisions_1-19-23.pdf.

[184] *See* TEX. UTIL. CODE § 39.601(b)(1).

[185] Act of May 30, 2021, 87th Leg., R.S., ch. 425, §§ 3, 4, 2021 Tex. Gen. Laws 830, 830-833 (S.B. 2) (codified at TEX. UTIL. CODE §§ 39.151, 39.1513); *see also* SUNSET ADVISORY COMMISSION, *supra* note 183 at 1 ("In response to the disaster, the Legislature took swift action, completely overhauling PUC's and ERCOT's governance structures and making numerous changes to the electric industry and market . . . ."); *id.* at 106.

[186] Act of May 30, 2021, 87th Leg., R.S., ch. 426, §§ 13, 16, 2021 Tex. Gen. Laws 833, 839-840, 841-843 (S.B. 3) (codified at TEX. UTIL. CODE §§ 35.0021, 38.075); *see also* 16 TEX. ADMIN. CODE § 25.55(b)(5), (d), (g); SUNSET ADVISORY COMMISSION, *supra* note 183, at 106.

[187] SUNSET ADVISORY COMMISSION, *supra* note 183, at A1.

[188] *Rosenberg*, 571 S.W.3d at 750.

purposes, and powers' of an 'arm of the State government'"[189] and because doing so satisfies the "political, pecuniary, and pragmatic policies underlying our immunity doctrines."[190] There is no evidence that ERCOT performs any functions outside its role as the ISO, but we note that ERCOT would not be immune outside that role. We also note that immunity would not bar CPS' constitutional claims.[191] Because we conclude that ERCOT enjoys sovereign immunity as an arm of the state, we need not and do not address ERCOT's argument that it is entitled to derivative immunity.

*  *  *  *  *

In No. 22-0056, *CPS Energy v. Electric Reliability Council of Texas*, we affirm the court of appeals' judgment. CPS' motion to stay the court of appeals' dissolution of the trial court's temporary restraining order is dismissed as moot. In No. 22-0196, *Electric Reliability Council of Texas, Inc. v. Panda Power Generation Infrastructure Fund, LLC*, we reverse the court of appeals' judgment and dismiss the case for lack of jurisdiction.

Nathan L. Hecht
Chief Justice

**OPINION DELIVERED:** June 23, 2023

---

[189] *Amex Props.*, 602 S.W.3d at 527 (quoting *Ben Bolt*, 212 S.W.3d at 325).

[190] *Rosenberg*, 571 S.W.3d at 750.

[191] *See City of El Paso v. Heinrich*, 284 S.W.3d 366, 372 (Tex. 2009).